## Page 1

```
 1           IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                      WESTERN DIVISION

 3  _____
    RONALD RICHARDSON, Individually,]
 4                               ]
           Plaintiff,            ]
 5                               ]
    v.                           ]
 6                               ]
    VARIETY STORES, INC., a Foreign ] Case 5:13-cv-00155-F
 7  Corporation,                 ]
                                 ]
 8         Defendant.            ]
    _____]

 9

10               DEPOSITION OF

11             * * * * * * *

12            CHARLES CHILDERS

13             * * * * * * *

14                Taken On

15     Friday, January 31, 2014 at 11:10 a.m.

16          In The Law Offices Of

17            Hutchens Law Firm

18            4317 Ramsey Street

19         Fayetteville, North Carolina

20

21

22

23

24  Reported By:
25  Tammy Johnson, CVR-CM-M
```

## Page 2

```
 1         A P P E A R A N C E S

 2

 3  ON BEHALF OF THE PLAINTIFF:

 4  Christopher D. Lane, Esq.
    3802A Clemmons Road
 5  Clemmons, North Carolina 27012
    (336)766-0229
 6  (336)766-9145 (Fax)
    cdllaw@juno.com
 7

 8  ON BEHALF OF THE DEFENDANT:

 9
    Paul J. Puryear, Jr.
10  Wyrick, Robbins, Yates & Ponton, LLP
    4101 Lake Boone Trail, Suite 300
11  Raleigh, North Carolina 27607
    (919)781-4000
12  (919)781-4865 (Fax)
    pjpuryear@wyrick.com
13

14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 3

```
 1                  I N D E X

 2

 3  WITNESS        DIRECT   CROSS   REDIRECT   RECROSS

 4  (Charles Childers)

 5  By Mr. Puryear   4-180          188-194

 6  By Mr. Lane             180-188           194-195

 7

 8                  * * *

 9              E X H I B I T S

10

11  PLAINTIFF'S      DESCRIPTION           PAGE

12               (None Marked)

13

14  DEFENDANT'S      DESCRIPTION           PAGE

15  Number 8     Curriculum Vitae of       46
                 Charles Childers
16
    Number 9     Expert Disclosure         66
17
    Number 10    Plaintiff's Rule 26(a)(2) 72
18               Expert Witness Disclosures

19

20

21

22

23

24

25
```

## Page 4

```
 1         I, Tammy Johnson, CVR-CM-M, being a Certified

 2  Court Reporter and a Notary Public in and for the state

 3  of North Carolina, was appointed to record the

 4  proceeding in the matter of Ronald Richardson,

 5  Individually, Plaintiff, versus Variety Stores, Inc., a

 6  Foreign Corporation, Defendant, on the 31st day of

 7  January, 2014, beginning at 11:10 a.m. in the offices

 8  of Hutchens Law Firm, located at 4317 Ramsey Street,

 9  Fayetteville, North Carolina.

10                  * * *

11  Thereupon:

12         CHARLES CHILDERS,

13  being first duly sworn in the manner provided

14  by law was examined and testified as follows:

15                  * * *

16  DIRECT EXAMINATION BY MR. PURYEAR:

17         Q. Would you please state your name for the

18  record?

19         A. Charles Childers.

20         Q. Good after- -- well, good morning, Mr.

21  Childers.  How are you?

22         A. I'm doing well.

23         Q. As you know, my name is P.J. Puryear, and

24  I represent Variety Stores in this matter.  Have you

25  ever had your deposition taken before?
```

EXHIBIT
5 6
ALL-STATE LEGAL®

1     A.  No.

2     Q.  Okay.  Let's -- let's go over a couple of

3  ground rules.

4             MR. PURYEAR:  Before we start

5          with Mr. Childers, Mr. Lane, I want us to

6          agree to the following stipulations, if

7          it's okay by you.  The reporter is

8          qualified to give the oath; that the

9          notice of deposition is proper; that

10         objections will be preserved except if

11         there's an objection to the form of the

12         question; and that the court reporter will

13         note the time we are on and off the

14         record, and that that time will govern the

15         amount of time I have with the witness.

16             MR. LANE:  Agreed.

17             MR. PURYEAR:  Great.

18     Q.  Let's go over a couple of items with what

19  to expect, Mr. Childers.  I'm going to ask a series of

20  questions trying to elicit a series of answers.  This

21  is the court reporter.  She's talking into a microphone

22  and creating a transcript of everything we say.  For

23  that reason, there's a couple of important things we

24  should keep in mind, the first of which is we shouldn't

25  talk over each other because she can't say what two

---

1  people are saying at the same time.  And I'll do my

2  best to do that.  It's a tendency -- we all get into

3  conjecture and back and forth, but if we could try our

4  best, that would be great.

5          Anytime you answer a question, that needs

6  to be verbal, yes, no, not uh-huh or huh-uh, not a

7  movement of the head, so that way she creates an

8  accurate record.  Is that okay?

9     A.  Yes.

10     Q.  Okay.  I'm going to do my best to ask

11  clear and concise questions.  At times, Mr. Lane is

12  going to object to the form of those questions.  That's

13  just to preserve it for the record.  If you understand

14  the question, I'd ask that you go forward with

15  answering it.  If at any particular period of time I

16  ask a question that you don't understand, please just

17  ask me to rephrase it.  Like I said, I'm going to do my

18  best to be clear, but if you need me to restate

19  something, just ask me, okay?

20     A.  Okay.

21     Q.  All right.  If you don't ask me to

22  restate a question, I'm going to under- -- I'm going to

23  assume that you understand the question.  Is that fair?

24     A.  That's fair.

25     Q.  Okay, great.  If at any particular period

---

1  of time you need to take a break, as Mr. Lane alluded

2  to before we started, let me know.  My only request is

3  that if we have -- if I've asked you a question, that

4  you answer the question before we take that break,

5  okay?

6     A.  (Nods head affirmatively.)

7     Q.  We've ordered lunch.  It's going to be

8  here at 12:45, so that gives us an hour and half.  But

9  if you need a break in that first hour and a half, you

10  let me know.

11     A.  All right.

12     Q.  If at any particular period of time you

13  recall or want to amend an answer, or recall new

14  information or want to amend an answer that you've

15  already given me, let me know.

16     A.  Okay.

17     Q.  I'm happy to go back and let you more

18  fully answer a question I've previously asked.  We'll

19  just pick back up where we left off.  I'm here to get

20  full testimony from you.  So by all means, if you do

21  remember something, please let me know.  If there's any

22  set of documents you think are helpful to a particular

23  response, you know, please describe them for me so I

24  can understand, you know, what may be helpful to your

25  testimony, okay?

---

1     A.  Okay.

2     Q.  Do you have any -- other than your stomach

3  bug, do you have any medical condition or illness that

4  may make it difficult for you to understand and

5  accurately answer my questions today?

6     A.  No.

7     Q.  Okay.  Do you take any medications for any

8  mental or memory problems?

9     A.  No.

10     Q.  Have you had any alcohol or drugs in the

11  past 18 hours?

12     A.  No.

13     Q.  Do you understand you must tell the full

14  truth?

15     A.  Yes.

16     Q.  Okay.  What is your current home address?

17     A.  30 -- 3520 Southwest 104 Avenue, Miami,

18  Florida 33165.

19     Q.  What was the beginning number again?

20     A.  3520.

21     Q.  3520, Okay.  Have you ever been arrested?

22     A.  No.

23     Q.  Have you ever filed for bankruptcy?

24     A.  Well, wait a minute.  Let's go back to the

25  original question, arrested.  Yes, I've been arrested.

9

1  Q. What were you arrested for?

2  A. For reckless driving.

3  Q. When was that?

4  A. I don't know. About five years ago.

5  Q. Where was it?

6  A. Miami.

7  Q. Doesn't everybody drive recklessly down

8  there?

9  A. Just to avoid getting into an accident,

10 yes.

11 Q. Okay.

12 A. It's almost mandatory you drive recklessly

13 to avoid accidents.

14 Q. Do you have any -- have you ever been

15 arrested for anything else?

16 A. No.

17 Q. Okay. Have you ever filed for bankruptcy?

18 A. No.

19 Q. When were you first contacted about this

20 case?

21 A. Sometime in 2012.

22 Q. Beginning of the year? End of the year?

23 A. I think it was toward the end of the year.

24 Q. Who contacted you?

25 A. I was contacted by Ronnie Richardson.

10

1  Q. Do you know how he got your contact

2  information?

3  A. Yes. He had my phone number.

4  Q. Do you know who gave it to him?

5  A. I believe I gave it to him.

6  Q. When did you give it to him?

7  A. I gave it to him probably earlier that

8  year.

9  Q. What were the circumstances of your

10 meeting?

11 A. There was a meeting that was called by

12 Jackie Blue, and we had a lunch meeting with -- Denise

13 Payne was there and Jackie Blue was there. Ronnie

14 Richardson was there, and I think there was a few

15 others. I don't remember everybody else that was

16 there. And it was basically an explanation of --

17 Denise had called the meeting, an explanation of what

18 National does, what National is about and so forth.

19 And that's how I met -- Ronnie was invited through

20 Jackie Blue to that meeting.

21 Q. And when you say National, are you

22 referring to National Alliance for Accessibility?

23 A. Yes, National Alliance for Accessibility.

24 Q. Okay. What's your affiliation with that

25 organization?

11

1  A. I have no affiliation with that

2  organization.

3  Q. Well, you have some affiliation with them.

4  You may not be a member, but --

5  A. Well, no official -- I'm not a member of

6  it, correct.

7  Q. Okay. All right. Did you help in forming

8  NAA?

9  A. No.

10 Q. When did you first learn about NAA?

11 A. First learned about it, that I don't

12 recall.

13 Q. Can you give me an approximate year?

14 A. I'd rather not guess.

15 Q. So you have no idea when you first learned

16 about NAA?

17 A. I don't remember the year.

18 Q. Was it last year?

19 A. It wasn't last year.

20 Q. Was it 2012?

21 A. It was not 2012.

22 Q. Okay. So you can say it was before 2012?

23 A. Yes.

24 Q. Let's go back to this meeting. After this

25 meeting you said Mr. Richardson called you. What did

12

1  y'all talk about?

2  A. He called me and stated that he had some

3  -- some issues that he had encountered at a Roses.

4  Q. What kind of issues?

5  A. Basically he said he had -- he had

6  problems with the restrooms and he had problems with

7  getting through the aisles.

8  Q. Do you recall anything else about the

9  conversation?

10 A. That was it. He asked me if I would come

11 up, take a look at it with him, take some measurements,

12 document to see what was maybe an ADA problem, maybe --

13 you know, sometimes they have difficulties where it's

14 not an ADA issue. It's just, you know, maybe their

15 arms are too short. So he wanted clarification to make

16 sure that the barriers, you know, were -- were there

17 and that they were enforceable under the ADA.

18 Q. When did you make the decision to serve as

19 an expert in this case?

20 A. Actually the day he called me up.

21 Q. So even though there was no lawsuit, you

22 had already decided to be an expert for the lawsuit?

23 A. No. A lot of times, I come up and there

24 will be a problem or there won't be a problem with a

25 particular location and then nothing further happens.

13

1 I give them advice and that's it.

2 Q. But if there was a case, you had already

3 made the decision you were going to be the expert for

4 the case?

5 A. No. I don't make that decision.

6 Q. Okay. So then the day he called you was

7 not the day you decided you were willing to serve as an

8 expert in the case, then, was it?

9 A. Again, I don't make that decision, you

10 know, about, you know, if I'm going to be the expert or

11 who's going to be the expert.

12 Q. Well, you certainly have the decision to

13 not be the expert, don't you?

14 A. Yes, I do have the decision to decline,

15 yes.

16 Q. Okay. So when did you make the decision

17 to become an expert in this case?

18 A. I never made that decision.

19 Q. So you're not going to be an expert in

20 this case?

21 A. No. I didn't say that. I said that it's

22 not my decision to make.

23 Q. Did anyone ever ask you to be the expert,

24 to serve as an expert witness in this case?

25 A. Yes.

14

1 Q. And who asked you to serve as an expert

2 witness in this case?

3 A. It would be Chris Lane.

4 Q. And when did Mr. Lane ask you to serve as

5 an expert witness in this case?

6 A. After I submitted the pictures and the

7 measurements and a report to Chris, then he asked me to

8 continue.

9 Q. And approximately when was that?

10 A. On this case, I want to say late 2012.

11 Q. So in late 2012, Mr. Lane asked you to

12 serve as an expert in this case?

13 A. Yes.

14 Q. Did you say yes?

15 A. Yes.

16 Q. So would that be the time in which you

17 decided to be an expert witness in this case?

18 A. Yes. I was asked and I decided to.

19 Q. How many other cases have you served as an

20 expert witness for Mr. Lane?

21 A. I don't remember the exact number.

22 Q. Can you give me an approximation?

23 A. I would rather not guess.

24 Q. More than 20?

25 A. I would say more than 20.

15

1 Q. More than 50?

2 A. I don't -- I don't know.

3 Q. So more than 20 and you're not sure

4 whether it's more than 50?

5 A. That's correct.

6 Q. Do you keep records related to each of the

7 cases in which you're asked to serve as an expert?

8 A. I don't keep them for long periods of

9 time, no.

10 Q. Do you have any file in relation to this

11 case?

12 A. No, not particularly. I submit all my

13 work to the attorney and that's it.

14 Q. Do you have any documents in your

15 possession that relate to this case?

16 A. No.

17 Q. What about e-mails?

18 A. No e-mails.

19 Q. Do you use e-mail?

20 A. I use e-mail, yes.

21 Q. Have you e-mailed Mr. Richardson?

22 A. No. I can't say that I have.

23 Q. Have you had e-mailed with Ms. Payne?

24 A. No. She doesn't have Internet.

25 Q. Have you e-mailed with Ms. Blue?

16

1 A. No.

2 Q. Have you e-mailed with Mr. Lane?

3 A. Yes. I believe I might have, yes.

4 Q. You believe you might have?

5 A. Yes.

6 Q. Have you inspected other Roses stores than

7 the one involved in this litigation?

8 A. Yes.

9 Q. What Roses stores have you inspected?

10 A. The Roses at Westwood Center. That's all

11 that I can recall right now.

12 Q. Have you inspected any other stores

13 operated by Variety other than the Roses at Westwood

14 and the Roses at Village?

15 A. I don't believe so.

16 Q. Up until the time you decided to serve as

17 an expert witness, had you been provided with any

18 documents in relation to the litigation?

19 A. Up until?

20 Q. Uh-huh.

21 A. I don't understand the question.

22 Q. Well, you said that Mr. Richardson called

23 you?

24 A. Yes.

25 Q. And that after he called, you agreed to

**17**

1  come up. Presumably, you came up and you performed an
2  initial inspection?
3      A. Yes.
4      Q. Okay. Up until that time, had anybody
5  provided you any documents related to that store?
6      A. No.
7      Q. Okay. And then you performed a second
8  inspection of the store?
9      A. A Rule 34.
10     Q. Correct.
11     A. Yeah.
12     Q. I was there for most of it.
13     A. Yes.
14     Q. And Mr. Lane was there.
15     A. Yes.
16     Q. Before that period of time, had anybody
17 provided you any documents related to that Roses?
18     A. No.
19     Q. Do you have any kind of written contract
20 or engagement letter with Mr. Lane?
21     A. I do not.
22     Q. What about Mr. Richardson?
23     A. I do not.
24     Q. Have you ever had any kind of written
25 contract or engagement letter with Mr. Lane?

**18**

1      A. No.
2      Q. What about with NAA?
3      A. No.
4      Q. I didn't see you with any kind of file or
5  papers, but did you bring anything other than your
6  phone and your glasses and your yogurt to the
7  deposition?
8      A. And my deodorant.
9      Q. And your deodorant. Did you bring
10 anything else to the deposition?
11     A. No, I did not.
12     Q. Okay. Have you seen any of the pleadings
13 in this litigation?
14     A. Let's see. What have I seen? I think
15 I've seen the complaint, and that's pretty much about
16 it.
17     Q. Have you seen Variety's answer to the
18 complaint?
19     A. No.
20     Q. Have you seen any of Mr. Richardson's
21 responses to the discovery submitted by Variety?
22     A. No.
23     Q. Have you seen any of Variety's responses
24 to the discovery submitted by Mr. Richardson?
25     A. No.

**19**

1      Q. Have you seen any of the 310 pages that
2  Variety has produced in response to that production --
3  excuse me -- in response to that discovery?
4      A. Three-hundred pages.
5      THE WITNESS: Would that be the
6      notebook?
7      A. Is he allowed to answer a question? I saw
8  -- I saw a notebook with several -- what looks like
9  several hundred pages, yes.
10     Q. When did you see this notebook?
11     A. Last night.
12     Q. What color was the notebook?
13     A. I believe it was white.
14     Q. Did you read anything that was in the
15 notebook?
16     A. I glanced through it.
17     Q. Tell me what you saw.
18     A. I saw lot of paperwork. It looked like
19 invoices, a collection of -- let's see. What else did
20 I see? I saw -- I believe I saw my report, my Rule 34
21 report. I saw a collection of invoices. Didn't quite
22 understand a lot of the -- a lot of the material that
23 was there, more than half. I pretty much only
24 understood my own report. It looked like a lot of
25 invoices. I remember seeing an invoice for a boiler or

**20**

1  something, which I don't know how -- what that had to
2  do with anything regarding this case. But there seemed
3  to be a lot in there. I don't know how much of it
4  pertained to this case, though.
5      Q. Okay. Did you read through any of the
6  documents that were in this notebook closely?
7      A. No.
8      Q. And other than the invoices and your own
9  report, do you recall any other documents from the
10 notebook?
11     A. No, I do not.
12     Q. All right.
13     MR. PURYEAR: Let's go off the
14     record for a second.
15     (OFF THE RECORD AT 11:26 A.M.)
16     (BACK ON THE RECORD AT 11:26 P.M.)
17     Q. Please list everything that you've
18 considered in forming the opinions that you're going to
19 offer today.
20     A. Let's see. The 1991 ADA standards, 2010
21 ADA standards, and MS [sic] Means construction data.
22 That's all I can recall.
23     Q. What about your visits to the store? Are
24 they going to be one of the bases for the opinions
25 you're going to offer today?

**21**

1    A.  Yes.  Visual -- visual visits, yes.

2    Q.  Anything else?

3    A.  Experience.

4    Q.  What are MS Means construction data?

5    A.  That's the industry standard for -- for

6  ascertaining prices to repair, replace materials.

7    Q.  Is there any kind of certification

8  involved in using MS Means construction data?

9    A.  No.

10    Q.  You didn't mention the 2004 standards.  Is

11  there a particular reason for that?

12    A.  No, no particular reason.

13    Q.  Would you consider those to be one of the

14  bases for the opinions you're going to offer today?

15    A.  Not particularly.

16    Q.  Why is that?

17    A.  2004, basically the -- a lot of the

18  standards that we're talking about in this case really

19  didn't change since 1991, so that's the reason why

20  1991, referring to those.  And we'll refer to 2010.

21    Q.  Did you make any notes when preparing for

22  this deposition?

23    A.  No.

24    Q.  Who have you talked to in the course of

25  preparing your opinions for this case?

**22**

1    A.  Myself.  That's it.  No one.

2    Q.  Have you talked to Mr. Richardson?

3    A.  No.

4    Q.  Well, you have talked to Mr. Richardson

5  before?

6    A.  Yes.  Yes.

7    Q.  Okay.  But your conversations with

8  Mr. Richardson do not have any impact on the opinions

9  you formed for this case?

10    A.  That's correct.

11    Q.  All right.  Have you talked to any other

12  members of your profession?

13    A.  In this case, no.

14    Q.  Did you talk to anybody with any kind of

15  financial or accounting background?

16    A.  No.

17    Q.  Did you talk to anybody from Variety,

18  other than me?

19    A.  No.

20    Q.  I assume I'm not going to form a basis of

21  your opinions for this case?

22    A.  You never know.

23    Q.  Have you ever spoken with any of the

24  employees at this store?

25    A.  No.  Well, only at the Rule 34, which --

**23**

1  which you were present.

2    Q.  And that was the store manager, Diane

3  McKimmon?

4    A.  I don't know.  I don't remember her name.

5    Q.  Have you spoken with any other Variety

6  employees at this store, other than the person you

7  spoke with at the Rule 34 inspection?

8    A.  No.

9    Q.  Have you ever spoken with any Variety

10  store employees other than the person you spoke to at

11  the Rule 34 inspection?

12    A.  No.

13    Q.  You've never spoken to any employees at

14  any of the other stores you've inspected -- any other

15  Roses stores you've inspected?

16    A.  Only to respond by "hello" when they say

17  hello.

18    Q.  Nothing of substance, then?

19    A.  Nothing of substance.

20    Q.  Did you request any documents be provided

21  to you in order to form a basis of the opinions you're

22  going to give today?

23    A.  No.

24    Q.  Did you request any specific documents to

25  form the opinions that you gave as a part of your

**24**

1  initial inspection or your Rule 34 inspection?

2    A.  Did I request any documents?  I have not

3  requested any documents.

4    Q.  Have you ever been qualified by any court

5  as an expert?

6    A.  I've had my fees approved by the Court.

7    Q.  When was that?

8    A.  I don't recall.

9    Q.  What case was it in?

10    A.  I don't recall.

11    Q.  Federal or state court?

12    A.  Federal.

13    Q.  So you've had your fees approved, but you

14  don't know whether or not you've ever been qualified by

15  the Court as an expert?

16    A.  That's correct.

17    Q.  Have you ever been excluded by any court

18  from presenting expert testimony?

19    A.  No.

20    Q.  Have any of your -- do you know whether

21  any of your expert reports have been stricken from the

22  record?

23    A.  They have not.

24    Q.  Has anyone tried to strike your expert

25  reports from the record?

25

1    A. No.

2    Q. What is your fee for this deposition?

3    A. I believe it's 250 an hour.

4    Q. What will your fee be for trial

5 appearance?

6    A. I don't recall. I'd have to refer to my,

7 you know, cost sheet.

8    Q. Will you charge to travel to North

9 Carolina and appear at trial?

10    A. Yes.

11    Q. How much will you charge to travel to

12 North Carolina?

13    A. I don't recall what the travel costs are.

14    Q. How much time do you have in this case so

15 far? Strike that.

16    Do you keep track of the amount of time

17 you spend on each case?

18    A. Yes.

19    Q. Where do you keep track of the time you

20 spend on each case?

21    A. On a ledger.

22    Q. And do you have one ledger for all of your

23 cases?

24    A. Huh-uh.

25    Q. You have one ledger for each case?

26

1    A. No, I have -- it looks like that. It's --

2 and when it fills up or when the case is done, maybe

3 two or three pages.

4    Q. Okay. Let's back up because I'm not sure

5 we got a good answer. That was my fault. I didn't

6 remind you to say yes or no.

7    A. Okay.

8    Q. So do you have a ledger for each case in

9 which you participate?

10    A. I have a -- I have -- I keep my hours on

11 ledger paper.

12    Q. Okay. My question is do you have a

13 separate ledger for your hours for each separate case,

14 or do you have one general ledger?

15    A. No. There would be -- each separate case

16 would have -- each set of papers would be different.

17 It's not just a running -- long-running journal, if

18 you will.

19    Q. Right. So if, --

20    A. Okay.

21    Q. -- for instance, if you're participating

22 in five cases right now, you would have five ledgers;--

23    A. Yes.

24    Q. -- is that correct?

25    A. That's correct.

27

1    Q. Okay. When you said that the ledgers look

2 like this, you pointed to Mr. Lane's yellow legal pad?

3    A. Yeah. It's a -- it's a -- I call that a

4 ledger pad.

5    Q. Okay.

6    A. You know, anything with lines.

7    Q. Okay. And what information do you put on

8 this ledger pad?

9    A. Usually just pretty much the hours.

10 That's it.

11    Q. Okay. So with respect to this case, you

12 have a ledger pad?

13    A. Yes.

14    Q. Okay. But you don't keep a file?

15    A. No. I don't -- I don't retain files.

16    Q. So the only thing in your possession that

17 relates to this case would be the ledger for the case?

18    A. That's correct.

19    Q. And then I assume you keep a copy of your

20 inspection reports?

21    A. Yes.

22    Q. Okay. Are those hard copies or are they

23 electronic copies?

24    A. Hard copies.

25    Q. Okay. Where do you keep the hard copies

28

1 of your inspection reports?

2    A. In my file cabinet.

3    Q. Okay. Well, you told me you didn't have a

4 file for the case, so where are the inspection reports

5 for this case?

6    A. I don't understand.

7    Q. All right. I asked you if you had a file,

8 right?

9    A. Yes.

10    Q. Which could mean a hanging file in a file

11 cabinet.

12    A. It could mean many things when you say a

13 file.

14    Q. Yeah, it could. You said no to all of

15 them. You said, "No, I don't have a file." And then

16 you told me you've got a general ledger and you keep

17 hard copies of your inspection reports --

18    A. Okay. I --

19    Q. -- let me finish. And so I'm just trying

20 to understand --

21    A. Right.

22    Q. -- the system that you've got in place.

23    MR. LANE: Objection.

24    A. I think that I -- I understood the

25 question to mean did I retain files, and I believe

**29**

1 that's what the question was. And that was my answer.
2 Do I currently have a file on this case? Yes.
3    Q. Okay. What's in that file?
4    A. In that file would be copies of my initial
5 report. It would be photos, copies of photos that were
6 included in that report. There would be my Rule 34
7 report, also copies of photos of that. And there would
8 be my invoice and, of course, my ledger notes.
9    Q. Okay. Do you know how much time you have
10 in this case so far?
11    A. I don't.
12    Q. When Mr. Richardson calls you and says,
13 "Mr. Childers, would you come up and inspect the
14 store," is that when your general ledger begins?
15    A. No, because I never know if it -- if
16 there's anything to go forward with or not. I mean,
17 there's several times you go to a place and it might be
18 the mirror is too high, you know, and I advise them. I
19 said, "Yes, you're right. The mirror is too high. I
20 suggest maybe write a letter or talk to somebody. It's
21 just a minor detail. It doesn't require a federal
22 case."
23    Q. With respect to this Roses, did you ever
24 tell Mr. Richardson to write this kind of letter?
25    A. No. I don't advise them on what to do,

**30**

1 you know, in that case so, no.
2    Q. Okay. Well, you just said, "Sometimes I
3 tell them just write a letter. It doesn't warrant a
4 federal case."
5    A. Well, true. True. Okay. So --
6    Q. So my question is, you know -- you said --
7 I mean, you already said no, you didn't ask Mr.
8 Richardson to -- or didn't tell Mr. Richardson to do
9 that; is that correct?
10    A. To write a letter; that's correct.
11    Q. Did you tell Mr. Richardson he should file
12 a lawsuit?
13    A. No, I did not.
14    Q. Have you been paid any money to date for
15 your involvement in this case?
16    A. I believe so.
17    Q. What have you been paid?
18    A. I don't recall.
19    Q. What have you been paid for?
20    A. I've been paid for work that's been done.
21    Q. Have you done any other work other than
22 the initial inspection and the Rule 34 inspection?
23    A. Besides being here? In addition to being
24 here?
25    Q. Yeah.

**31**

1    A. I don't believe so, no.
2    Q. Okay. Don't you worry. I've got a check
3 for you being here too, so.
4    A. I appreciate that.
5    Q. The amount you've been paid, is it less
6 than $10,000?
7    A. Yes.
8    Q. You mentioned this notebook that you saw
9 yesterday; is that correct?
10    A. Yes.
11    Q. All right. Was that at the meeting you
12 had with Mr. Lane and Mr. Richardson?
13    A. I'm sorry?
14    Q. Was that at the meeting you had with Mr.
15 Lane and Mr. Richardson?
16    A. Yes.
17    Q. Okay. Did you do anything else to prepare
18 for this deposition?
19    A. No.
20    Q. How long was the meeting you had with Mr.
21 Lane and Mr. Richardson?
22    A. I believe about an hour.
23    Q. Where was it?
24    A. It was at a restaurant. Actually, we were
25 having dinner.

**32**

1    Q. Other than talking with Mr. Lane and Mr.
2 Richardson and looking or glancing, as you said,
3 through that notebook of a hundred pages, did you do
4 anything else to prepare for this deposition?
5       MR. LANE: Objection.
6    A. No.
7    Q. Okay. So the only documents you've
8 reviewed would have been those pages you glanced at in
9 the notebook; is that correct?
10    A. That's correct.
11    Q. And of those, the only things you can
12 distinctly remember were the invoices and your own Rule
13 34 inspection report?
14    A. That's correct.
15    Q. Okay. Did you see your initial inspection
16 report in there?
17    A. I don't remember.
18    Q. Have you ever testified before a jury?
19    A. No.
20    Q. What areas of expertise do you contend you
21 can offer the court in this case?
22    A. Areas of expertise, well, I'm a certified
23 ADA coordinator through a program at the University of
24 Missouri. I have 11 years of ADA work-related
25 experience.

**33**

Q. I appreciate that, but let me re-ask the question. I mean, I understand what you're getting at, but just so we're clear, my question was what areas of expertise do you contend you can offer the Court in this case, and you've told me that you're certified ADA coordinator through a class at Mizzou and that you're -- University of Missouri -- and that you have 11 years' experience.

A. Working in ADA-related cases, yes.

Q. Okay. So is the only --

A. And projects.

Q. Is the only other expertise that you contend you can offer the Court, that which is related to the Americans with Disabilities Act?

A. Yes.

Q. Okay. What does that mean -- when you hear someone say you're going to be an expert on the ADA, what does that mean to you?

MR. LANE: Objection.

A. What does it mean to me?

Q. Yeah.

A. It means that you're able to -- that you -- that you've had some training in the ADA; that you've been through courses; you've been through -- when they change the accessibility code in 2010, you've been

**34**

through subsequent courses that teach you the difference and so forth. So that's what I would say --

Q. So -- so when they changed the --

A. -- to answer your --

Q. -- I'm sorry. I didn't mean to talk over you.

A. Yeah. That's what I would say to answer your question.

Q. So when they changed the ADA in 2010, did you take subsequent courses to that change?

A. Yes.

Q. What courses did you take?

A. They were offered -- a series of symposiums, ADA symposiums in Orlando, Florida.

Q. And who were those symposiums offered by?

A. Actually, and one in Las Vegas.

Q. Well, that's a good place for a symposium, if you ask me. Who were -- who were these symposiums offered by?

A. National ADA Symposium.

Q. Is that the pen you have in your pocket?

A. Yes.

Q. Okay. All right. So would you consider yourself proficient in the 2010 ADA standards?

A. 2010, yes.

**35**

Q. And would you consider yourself proficient in the 1991 ADA standards?

A. Yes.

Q. Are you going to offer -- strike that.

Do you believe that you have any experience that would allow you to qualify as an expert in anything other than the application of the Americans with Disabilities Act?

A. No.

Q. What's the highest level of school you've attended?

A. Associate of science.

Q. When did you graduate?

A. I don't recall. It's been awhile.

Q. We'll get to your resume in a second.

A. Yeah.

Q. Now, you've taken classes since you received your associate's of science -- associate of science; is that correct?

A. That's correct.

Q. And your associate of science doesn't relate in any way to your current profession?

A. That's correct.

Q. Okay. What is your current profession?

A. My current profession, I work -- I have my

**36**

-- my company is ADA Assistance Group.

Q. You say it's your company. Are you a principal?

A. Yes.

Q. What's your title?

A. President.

Q. Are you a founder?

A. Yes.

Q. Are you the only founder?

A. Yes.

Q. How long have you been the president of ADA Assistance Group?

A. Since 2007.

Q. Is that your full-time job?

A. Yes.

Q. Do you currently do any other work than your work through the ADA Assistance Group?

A. Yes.

Q. What other work do you do?

A. I work on various projects.

Q. What does that mean?

A. It means part of my background is corporate finance. And from time to time, I work on projects related to raising money to fund different projects.

**37**

Q. When you say that a part of your background is corporate finance, what does that mean?

A. That means that I spent a year -- several years in -- as part of a team to raise money for projects for companies that required funding to go to their next stage of development.

Q. Okay.

A. So what you -- what we would call early stage financing.

Q. Seed financing, angel investing, --

A. Right.

Q. -- things of that nature?

A. That's correct.

Q. Okay. Do you have any corporate finance experience other than your years spent raising money for start-up companies?

A. I have no formal education in corporate finance.

Q. Right. I appreciate that, but my question was whether you had any other experience in corporate finance other than the years you spent raising money for early start-up companies?

A. I would say no.

Q. Okay. Sorry if I'm talking too fast. I apologize. I do that sometimes. Approximately how

**38**

much time a month do you spend -- strike that.

Have you spent any time in 2014 working on these various projects?

A. Yes.

Q. And how much time have you spent in 2014 on -- on this -- these various projects?

A. Right now it seems to be like a couple hours a week.

Q. Okay. And what kind of work are you doing right now?

A. I'm working on a very interesting project that involves my son. And he has developed what we believe is some new technology, which is in the process of being patented as we speak. Its primary use will be in school safety. And currently it is being introduced in the Miami-Dade Public School System and they love the idea, and so they're in the process now -- in fact, they've just given him his first order to do that. And after that, we expect that it will go nationwide. We wanted to give Miami-Dade -- everything in Miami, as I'm sure with most small cities, is political, so we wanted to let them be the flagship to launch this new technology, so.

Q. And are you doing anything in relation to that project other than trying to raise capital?

**39**

A. Actually, this particular project doesn't require capital. So what I am doing there is advising my son and basically from time to time and how -- what direction to go and so forth.

Q. Okay. Now, you say you're spending a couple of hours a week or that. What about in 2013? How much time would you say you spent each week in 2013 on projects not related to the ADA?

A. I would say about the same.

Q. About the same. And with this particular example, you said that there's no corporate financing involved, but that was the only example you gave me with respect to the various projects in which you engaged.

A. Uh-huh.

Q. With respect to 2013, did you engage in any other projects than corporate finance and your son's business?

A. Other than corporate finance?

Q. Correct.

A. No.

Q. Okay. I'm just trying to understand what you mean by various projects, and it sounds like typically --

A. Oh. Oh, yeah, they're all corporate

**40**

finance related.

Q. Well, except for the one with your son?

A. Well, even that would be considered -- I would consider it corporate finance.

Q. Okay. Even though that one doesn't require any financing?

A. At this time; that's correct.

Q. In the last five years, have any of the various projects you've worked on outside of your work related to the ADA involved anything other than raising money for early start-up companies?

A. Other than raising money?

Q. (Nods head affirmatively.)

A. Well, there's -- there's a lot more involved than just raising money. When you get involved in a project, there's the formation of the project. There's the writing of a business plan. There's strategizing. And then when you get to the point of where it's time to raise money, then that's when that kicks in. So I hope I answered your question.

Q. Let me follow up and say with each of those stages that you've just mentioned, formation of a business plan, execution of the plan, reaching the stage of needing capital, you participate in all those

41

stages?

A. Yes.

Q. And that's work you've done in the last five years?

A. Yes.

Q. What kind of businesses have you done that for?

A. Actually, it goes back beyond five years.

Q. I know, but I'm interested in the last five years.

A. The last five years. The last five years, besides my son's project, it would probably be one other project.

Q. Okay. And what project was that?

A. The name of it is National Accessibility Foundation.

Q. Is that related to the ADA?

A. It kind of does.

Q. What does the National Accessibility Foundation do?

A. It is -- it is -- it was set up as a 501(c)(3) nonprofit. Its mission is to offer low-interest, no-interest loans to property owners to assist them in removing barriers from their properties.

Q. And what work have you done for the

42

National Accessibility Foundation?

A. What work have I done?

Q. Uh-huh.

A. I'm in the process now -- I'm about 90 percent finished writing their business plan.

Q. And so in the last five years, the only two projects you've worked on that have been unrelated to your -- we'll call it ADA inspection work --

A. Sure.

Q. -- loosely -- would be your son's project and the business plan for the National Accessibility Foundation?

A. Yes.

Q. Okay. What about -- you made mention that this went back further than five years. So discuss or tell me, you know, what other experience you've had outside of the ADA context.

A. I've worked on various projects. I've worked on -- I mean, there's -- a lot come to mind. I've done small projects. I've done larger projects. I mean, how many do you want me to go through?

Q. Well, discuss generally the areas of work that you've done outside of the ADA context. How about that?

A. Okay. Well, how about if I describe the

43

projects to you and --

Q. Sure.

A. All right. Basically my role generally -- and I was part of a team back then. My role generally is to write the business plan and to, you know, assist in strategizing on how to go forward. Other members of the team were specialized in the actual raising of funds and so forth and that's pretty much what they did, even up to the point of taking the companies public for initial public offering.

Q. And what -- is there any particular type of business that you assisted? So there's -- I mean, let me frame that for you. I understand you talked about early start-ups all the way through public. I'm not interested in that. I'm more interested in the substance of the business. You know, are they IP? You know, are they McDonald's? Are they school systems? What types of businesses have you assisted?

A. Some of them have been IP. Some of them have been legal. Some of them have been -- I think that's about all I can recall right now.

Q. Okay. Have any of them been retail?

A. Retail. I don't believe so.

Q. Have you ever published -- let's turn back to the ADA now.

44

Q. Okay.

Q. I think I've gone far enough down that rabbit hole. With respect to the ADA, have you published any literature, articles, or books?

A. No.

Q. Have you lectured at any seminars?

A. Yes.

Q. What seminars have you lectured at?

A. Title III, Public Accommodations.

Q. And how many seminars do you believe you've lectured at?

A. Two.

Q. And when were they?

A. I think one was last year and one was the year before.

Q. And so was your presentation on any specific aspect of Title III?

A. It's a -- it's course that goes into the history of -- the history of the ADA, Congress's intent, then goes into the specific titles.

Q. Well, you say the specific titles. Did you -- did you discuss anything beyond Title III?

A. Yes. We discussed Title I, Employment; Title II, State and Federal; Title III, Public Accommodations; Title IV, Telecommunications; Title V,

**45**

1    Miscellaneous.

2      Q. So you're familiar with the congressional

3  intent behind each of these titles?

4      A. Yes.

5      Q. Have you read all the materials produced

6  by the House and the Senate and the committees that

7  have dealt with the ADA?

8      A. I don't believe I've read every article,

9  no. I don't believe I would have ever had time to have

10 done such.

11     Q. Have you read some of them?

12     A. Yes.

13     Q. Okay. Do you mind if we put this on the

14 floor?

15     A. Oh, no, not at all.

16     Q. We had a series of deposition exhibits

17 when Mr. Richardson was deposed before you. They're

18 sitting in front of you, and they're marked Exhibits 1

19 through 7. I believe they're in reverse order.

20     A. Okay.

21     Q. I'm going to refer to those eventually.

22 But in the meantime, I'm going to start showing you

23 some other exhibits, but I just want to let you know

24 what the documents were in front of you so you knew,

25 okay?

**46**

1       (DEFENDANT'S EXHIBIT NUMBER 8 WAS MARKED

2       AND HANDED TO THE WITNESS.)

3     Q. I'm going to show you what's now been

4 marked as Deposition Exhibit 8 and ask whether or not

5 you recognize this document?

6     A. Yes.

7     Q. And what is it?

8     A. I'm sorry?

9     Q. And what is it?

10    A. Oh. It's my C.V.

11    Q. Okay. Can you tell me the last time that

12 this was updated?

13    A. I cannot.

14    Q. You mentioned you took classes through the

15 University of Missouri. Did you get any kind of

16 certificate --

17    A. Yes.

18    Q. -- of completion for that?

19    A. Yes.

20    Q. All right. I don't see that listed on

21 here on page 4, which I assume would be under either

22 "Education" or "Membership" --

23    A. Oh, then in answer your to question, yeah,

24 I do see what would date this, and that is that, yeah,

25 there is a substantial -- it doesn't go past 2009. So

**47**

1 this looks like to be -- we could assume that it's an

2 old C.V.

3     Q. Okay. Well, I'll represent to you that

4 this was the C.V. that was attached to the expert

5 disclosure signed by your -- not by your attorney, by

6 Mr. Lane. So what -- is there a more recent copy of

7 your C.V. that you have?

8     A. Yes, there is.

9     Q. Okay. And what's on that more recent copy

10 of the C.V. that's not on this copy?

11    A. I couldn't answer in the entirety. I --

12 at first glance, though, I can see that the -- yeah,

13 that certification is not here. I can see that there

14 are certain classes that were taught that are not here.

15 I've already -- that's in answer to your previous

16 question that you asked about.

17    Q. The two -- the two --

18    A. Yes.

19    Q. -- seminars you gave?

20    A. That's correct.

21    Q. Okay. Have you had any other

22 certifications since 2009, other than the 2010

23 certification you received from the University of

24 Missouri?

25    A. Not certifications. Basically they're

**48**

1 more of certificate of attendances of symposiums that I

2 mentioned earlier.

3     Q. The ones in Miami and Las Vegas?

4     A. The one in Orlando.

5     Q. Orlando.

6     A. And Las Vegas, yes.

7     Q. Have you received any certificates of

8 attendance other than the one -- other than the two

9 symposiums you attended in Orlando and Las Vegas?

10    A. Since 2009, I don't believe so.

11    Q. Looking -- let's start at the back page

12 here on page 4 under "Licenses and Degrees." You've

13 listed the associate of science. Is that the same

14 associate of science we discussed earlier?

15    A. That's correct.

16    Q. And did you -- it appears that you got

17 that in 1982, looking at your education and membership,

18 from Miami-Dade Community College.

19    A. Okay.

20    Q. All right. Is that correct?

21    A. That's correct.

22    Q. Okay. And then above that, it says in

23 2004 you received a certificate of completion,

24 Americans with Disabilities Act with State of Florida

25 Amendments from B.T. Builders, Inc. Who is B.T.

49

1 Builders, Inc.?

2 A. B.T. Builders, Inc., I don't know who that

3 is. I just took a course from them that was given at a

4 college, maybe Broward Community College, to be exact.

5 Q. How long was that class?

6 A. The class was -- I believe it was -- I'd

7 rather not guess.

8 Q. Did you meet weekly?

9 A. No. I think it was two days at eight

10 hours --

11 Q. Total?

12 A. -- each day. Yes.

13 Q. All right. So like a weekend class?

14 A. Yes.

15 Q. All right. And it says that this is

16 completion of Americans with Disabilities Act with

17 State of Florida Amendments. Do you know what what

18 refers to?

19 A. I guess in 2004 they were talking about

20 the state of Florida, the building code, the --

21 Q. So this class -- I'm sorry. I didn't mean

22 to interrupt. Go ahead.

23 A. The building code for 2012. I mean --

24 sorry -- 2004.

25 Q. And that would be the Florida building

50

1 code?

2 A. Yes.

3 Q. Okay. And then you list here that you're

4 -- in 2009 you became a building safety professional

5 and it lists the International Code Council. What did

6 you have to do in order to become a building safety

7 professional?

8 A. Actually there, I am a member of the ICC.

9 Q. Okay.

10 A. That's just a classification of which they

11 call it, building safety professional.

12 Q. Okay. Do you have to pay to become a

13 member of the ICC?

14 A. Yes.

15 Q. All right. So this is just saying you've

16 paid to become a member of the ICC at the building

17 safety professional level?

18 A. Yes, which has entitled me to all of their

19 ICC international code literature and so forth.

20 Q. Okay. Are there any other member benefits

21 to the ICC?

22 A. Not really.

23 Q. Do you have any -- so are there any other

24 certifications that you've received other than the 2004

25 certificate of completion, the 2010 certification that

51

1 came with the class at University of Missouri and the

2 certificates of attendance for the two seminars?

3 A. That's correct.

4 Q. There's nothing else?

5 A. Not that I can remember at this time.

6 Q. What did you do professionally from 1982

7 to 2004?

8 A. 1982 to 2004, corporate finance.

9 Q. And so we're saying the same thing; when

10 you say that you did corporate finance, this refers to

11 helping with the raising of capital for early start-up

12 companies?

13 A. Yes.

14 Q. Okay. Did you do anything else in helping

15 early start-up companies raise capital during this

16 particular period of time?

17 A. Do anything else then?

18 Q. Yes.

19 A. No.

20 Q. Okay. During that particular period of

21 time, were any of the experiences you had related to

22 retail?

23 A. No.

24 Q. Did you do any ADA-related work prior to

25 2004?

52

1 A. Yes, 2003.

2 Q. And what did you do in 2003?

3 A. 2003, that was also corporate finance

4 related. It was a blend, actually. 2003, I was doing

5 corporate finance, and one of -- a gentleman who I

6 worked with in the past who would bring the team

7 different projects -- are you familiar with Shark Tank?

8 Do you ever watch that?

9 Q. No.

10 A. Okay. That's the easiest -- easiest way.

11 It's kind of like Shark Tank. People would bring us

12 projects. They give a demonstration and so forth.

13 We'd talk about it. They'd show us their -- whatever

14 business plan they have at that time and, you know, we

15 discuss it and so forth. Then we decide whether or not

16 we're going to go forward with that particular project

17 or not and assist them in funding it.

18 In this particular case, this gentleman

19 brought me a project. He says, "I know it's not what

20 you normally do." He says, "But I have this attorney

21 who needs some help." And he says, "I know it's a lot

22 smaller than what you're usually, you know, involved

23 in." And he says, "But he's a nice guy. I'd like you

24 to spend some time and meet with him." So I did.

25 And basically he -- he was a ADA attorney.

53

1  His name was James Johnstone. And his problem was he
2  was very busy and filing and working a lot of ADA
3  cases, and it was costing him on average about $1,500,
4  he thought, per case to do this. And so he was looking
5  for -- and he didn't have the money or the filing fees
6  and the secretarial to keep up with the workload that
7  he had. So he was looking for some type of financing
8  arrangement. And so that's how I got involved with
9  this particular project.
10      So I asked him -- I said, "Okay, show me"
11  -- you know, he explained to me the whole thing about
12  the ADA and how, you know, the plaintiffs -- it's
13  different than PIP work, you know, where, you know, the
14  plaintiffs -- you know, in an auto injury case, the
15  plaintiffs get paid and so forth for their injuries and
16  so forth. He explained to me in the ADA, it's not like
17  that at all. And I asked him for some historicals and
18  so he presented me the historicals and sure enough,
19  they beared out and it seemed like something that
20  should be financeable, so.
21      Q. And that was your introduction to the ADA
22  world?
23      A. That was my introduction to the ADA world.
24      Q. Okay. And then according to your resume,
25  it looks like in 2004 you became a consultant for

54

1  Accesssolutions.com?
2      A. That's correct.
3      Q. And it appears that the purpose of
4  Accesssolutions.com was to provide services related to
5  ADA compliance?
6      A. That's correct.
7      Q. Okay. And so at this time you started to
8  perform compliance inspections?
9      A. Yes.
10      Q. All right. And it looks here -- according
11  -- it looks like, according to your resume, you started
12  to do some activity related to litigation. You list
13  document review and then initial and Rule 34 report
14  preparation; is that correct?
15      A. Yes. We did -- did several different --
16  it wasn't all litigation. We had -- we worked on a
17  special project that was -- it wasn't sponsored by the
18  Department of Justice, but it happened that -- it
19  happened to a national grocery chain. And they
20  were sued by the Department of Justice, and they
21  attempted to fix their properties on their own and
22  failed. DOJ gave them some additional time and they
23  failed again. And so the DOJ required them to go out
24  and hire outside experts, ADA experts. So I was one of
25  the persons that was hired by the national grocery

55

1  chain to perform these inspections.
2      Q. Did you do anything other than performing
3  inspections in relation to this?
4      A. No.
5      Q. Okay. And so we're saying the same thing
6  -- I mean, I think we are but let's just make sure.
7  When -- when I say perform an inspection, I mean go to
8  the property, determine whether or not the aspects of
9  the property comply with the technical regulations of
10  the ADA and the Code of Federal Regulations.
11      A. Yes.
12      Q. Is that what you mean when you say perform
13  inspections?
14      A. Perform inspections and also fill out
15  reports.
16      Q. Okay. And fill out reports.
17      A. Yeah.
18      Q. And so the inspection is -- is really just
19  a black-and-white determination of whether or not the
20  aisles are a permissible width?
21      A. Yes.
22      Q. Whether or not the bathrooms are
23  compliant?
24      A. Yes.
25      Q. Whether or not the checkout counters are

56

1  compliant?
2      A. Yes.
3      Q. And your determination was solely to be
4  whether or not those measurement requirements to the
5  ADA were, in fact, complied with?
6      A. Yes. And in addition to that, I was -- I
7  was asked to actually provide the actual measurements,
8  whatever they were.
9      Q. Right. Okay. And that would be a part of
10  what would be in your report?
11      A. Yes.
12      Q. Okay. Did you -- and that was the extent
13  of your involvement with respect to this --
14      A. Project.
15      Q. -- grocery store chain project?
16      A. Yes.
17      Q. Okay. Now, your resume says -- or your
18  C.V. says that you started ADA Assistance Group, Inc.
19  in 2007; is that correct?
20      A. Yes.
21      Q. But during this particular period of time,
22  you were still serving as a consultant for ADA
23  Compliance Team, Inc.?
24      A. Yes. Well, actually, yes, there was some
25  overlap.

57

Q. Okay. Where is ADA -- is ADA Compliance Team, Inc. still in business?

A. I don't know.

Q. Now, the last sentence in the paragraph you have under ADA Assistance Group, Inc., you say that "Our involvement in litigation cases, whether working for the plaintiffs' lawyers or the defendants' lawyers, is with the goal of accomplishing improved accessibility and compliance with the requirements of the ADA consistent with the intent of the ADA, that such accessibility should be accomplished at reasonable cost and effort." Did I read that correctly?

A. That's correct.

Q. Hopefully slowly enough. All right. What do you mean when you say "at reasonable cost and effort"?

A. What I mean there is the ADA requires that barriers be removed that are readily achievable. And in these particular -- what I also mean, in addition to that, is that if we can find a method -- I mean, to remove a barrier, there are several -- there's usually several ways of removing the barrier. Some are more expensive than others.

Q. Okay.

A. So that's what I meant by that sentence.

58

Q. So, in other words, if you were advising a business and they had two ways to remove a barrier, you would educate them about the choices and advise them to choose the one that costs less money?

A. No. I would advise them what their choices are and they would choose.

Q. All right. So if a business had two choices, one was more expensive than the other, and the goal of your organization is to accomplish the absence of violation, right --

A. Uh-huh.

Q. -- meet the requirements of ADA at a reasonable cost, wouldn't you think that a business would typically choose the lesser expensive option?

A. Sometimes they do; sometimes they don't, primarily because of aesthetics or maybe they decide one methodology actually helps with customer relations. So it's -- but the choice is always totally up to them.

Q. In 2013 how many times did you personally perform inspections for defendants in lawsuits?

A. 2013?

Q. Yes.

A. I don't know that number.

Q. Did you ever perform any inspections for defendants in lawsuits?

59

A. In 2013?

Q. Correct.

A. Yes.

Q. Was it more than ten?

A. Yes.

Q. Were any of them located in North Carolina?

A. Yes.

Q. Do you recall the names of those located in North Carolina?

A. No. I don't recall the names.

Q. How many defendants in North Carolina do you think you performed inspections for in 2013?

A. I can't recall.

Q. Have you ever been designated as an expert by any defendant in a lawsuit?

A. Designated by the defendant in a lawsuit? Yes.

Q. When?

A. 2013.

Q. Who was that?

A. Let's see. I don't recall the name. It was a person that owned two gas stations and was being -- he was -- he was sued at one of the gas stations, and since he owned the two, he wanted to do something

60

proactively. So he asked me, in addition to providing the inspection and the report, "Please do my other gas station."

Q. What kind of gas station was it? Do you know?

A. You mean the name brand?

Q. Yeah.

A. I don't recall.

Q. Where was it located?

A. Broward County.

Q. Broward County, Florida?

A. Yes, Broward County, Florida.

Q. Okay. So that's the only time you recall being designated as an expert by the defendant; is that correct, in 2013?

A. Yes, in 2013.

Q. Okay.

A. Involving litigation.

Q. Well, there wouldn't be a defendant otherwise.

A. That's true. But I have been called to perform proactive inspections to avoid litigation.

Q. On the first page of your C.V., the last sentence on the first page, you say, "It is our mission to facilitate fiscally responsible solutions and

**61**

1  proactively addressing the removal of architectural and
2  communication barriers in today's society."  What do
3  you mean when you say "facilitate fiscally responsible
4  solutions"?
5      A.  To assist in finding financial solutions
6  to their barrier and removal problem.
7      Q.  Well, how do you determine if that
8  solution is fiscally responsible?
9      A.  Fiscally responsible would be anything
10  that gets the job done of removing the existing
11  barriers.
12      Q.  That doesn't have anything to do with the
13  fiscal nature of the fix, though, what you just said.
14      A.  Well, the fiscal nature is actually the
15  cost.
16      Q.  Right.
17      A.  Right.  And we went over before there were
18  several -- there's usually several different ways of
19  which you can remove a particular barrier.
20      Q.  Have you ever encountered a situation
21  where you've advised a defendant that removal of a
22  barrier was not readily achievable?
23      A.  Yes.
24      Q.  Provide me an example.
25      A.  An example would be where you're in a

**62**

1  parking lot where there is a steep slope and there's
2  not enough room to repave because there's a sidewalk or
3  something that's abutting that.  There's not enough
4  room to repave it so that you can get to a accessible
5  slope.  That would be not readily achievable,
6  especially if it ran into the hundreds of thousands of
7  dollars to do so.
8          But that being said, there are -- the --
9  there's a second prong on readily achievable, and
10  that's the financial ability of the particular entity
11  to fix, so it's really relative.  There's -- there's --
12  what's -- what's readily achievable is different in a
13  -- let's say Bob's Restaurant, you know, 15, you know,
14  whatever, a 3,000-square-foot restaurant versus Simon
15  Properties, you know, which is a mall.  Let's just say
16  it's one of their malls, okay?  There's a big
17  difference in their financial ability to remove
18  barriers, and so that's one of the prongs that's used
19  when you define what's readily achievable.
20      Q.  And would this, you know, desire of yours
21  to facilitate fiscally responsible solutions, it sounds
22  like you analyze some of the same data in determining
23  what's fiscally responsible as you would in determining
24  what's readily achievable; is that correct?
25      A.  Yes.  That's correct.

**63**

1      Q.  So in order to determine whether or not
2  something is fiscally responsible or readily
3  achievable, you've got to consider all the factors that
4  are listed in the statute to define readily achievable;
5  is that correct?
6      A.  Absolutely, yes.
7      Q.  Okay.  And that would include both the
8  financial resources of the premises, you know, the
9  entity that's the part of the defendant, and you said
10  the financial resources of the overall entity; is that
11  correct?
12      A.  That's correct.
13      Q.  So if you did not analyze -- would there
14  ever be instances where the failure to analyze that
15  information would render you unable to determine that
16  removal of a barrier is readily achievable?
17          MR. LANE:  Objection.
18      Q.  Let me put it a different way, all right?
19  I own Bob's Restaurant, right, and you come in and you
20  see that my mirror is placed too high.  And you say,
21  "P.J., that mirror is to high.  Here are the regs that
22  say it's got to be only so many inches off the finished
23  floor."  You wouldn't need to really see how much money
24  I had in order to determine whether or not the fix is
25  readily achievable, would you?

**64**

1      A.  That's correct.
2          MR. LANE:  Objection.
3      Q.  Okay.  If the space in between the
4  banquettes, the booths on the side of the restaurant,
5  you know, and there are another row of booths there,
6  and the distance doesn't satisfy the ADA, the aisle
7  distance, --
8      A.  Uh-huh.
9      Q.  -- and you come to me and you say, "Well,
10  we've got to move those."  And I say, "Well, I'm going
11  to lose a row of tables on the other side," right --
12  Bob's Restaurant, it's all about turnover, getting
13  people in and out and sell food -- would you have to
14  analyze the finances of Bob's Restaurant in order to
15  determine what potential options I would have in terms
16  of making readily achievable modifications?
17          MR. LANE:  Objection.
18      A.  It would be one of my considerations.
19      Q.  It would be one of your considerations?
20  And so what would you need in order -- in that
21  situation, to determine whether or not -- or to
22  determine which modifications would be readily
23  achievable, in your opinion?
24      A.  I think the answer would be better served
25  as I would -- in that particular scenario, I might

65

1 suggest that maybe he -- if the answer was to increase
2 the space, which means he lose a -- loses a booth,
3 let's say, --
4　　　Q. Or a row of booths.
5　　　A. -- or a row of booths, I might suggest
6 that maybe he put in some tables instead so you still
7 have the same headcount and still become ADA compliant.
8　　　Q. Going back to your C.V., the third
9 paragraph here, it says that you've provided services
10 for law firms by reviewing and analyzing documents,
11 providing attorneys with strengths and weaknesses of
12 the case, conducting accessibility reviews, writing the
13 reports we've talked about, and determining reasonable
14 accommodations and identifying general discriminatory
15 practices. Is all this related to the technical nature
16 of the ADA?
17　　　A. I'm sorry. Where are you reading from?
18　　　Q. The first page.
19　　　A. Okay.
20　　　Q. Right at the third paragraph under
21 "Professional Experience." You list the different
22 services that you provide to law firms.
23　　　A. Okay, yes.
24　　　Q. Okay. And I just -- I -- I think we've
25 covered this, but I just want to make sure.

66

1　　　A. Uh-huh.
2　　　Q. This all relates to your -- your
3 understanding of the technical requirements of the ADA;
4 is that correct?
5　　　A. Most of the time, yes.
6　　　Q. Okay. What else do you provide them
7 services in respect to?
8　　　A. I guess it would pretty much all relate to
9 the ADA.
10　　　Q. Is the address here at the top still
11 correct, this 3876 Southwest 112 Avenue?
12　　　A. No. It's 12742.
13　　　Q. That's all one number?
14　　　A. Yes.
15　　　Q. Okay.
16　　　A. Southwest -- I'm sorry. 12741 Southwest
17 42 Street, same number, number 115, Miami, Florida
18 33175.
19　　　Q. Is your phone number is still accurate?
20　　　A. Yes.
21　　　Q. Is your e-mail address still accurate?
22　　　A. Yes.
23　　　Q. Okay.
24　　　　(DEFENDANT'S EXHIBIT NUMBER 9 WAS MARKED
25　　　　AND HANDED TO THE WITNESS.)

67

1　　　Q. I'll show you what's been marked as
2 Deposition Exhibit Number 9 and ask if you've ever seen
3 this document?
4　　　A. Yes, I have.
5　　　Q. When have you seen it?
6　　　A. Not in awhile.
7　　　Q. What does that mean?
8　　　A. I guess I saw a document that was similar
9 to this. Let me put it that way. Let me rephrase my
10 answer.
11　　　Q. All right. So you've seen a document
12 similar to this. Have you ever seen this document?
13　　　A. No.
14　　　Q. You've never seen this document?
15　　　A. I have not.
16　　　Q. All right. If you look at the first page
17 where it says number 1, it lists your name. That's not
18 the correct address of your company, is it?
19　　　A. No. That's the old address.
20　　　Q. Okay. And your signature doesn't appear
21 anywhere on this document, does it?
22　　　A. No, it doesn't.
23　　　Q. Okay. Great. This is a document that was
24 served by Mr. Lane, and I just want to go over this in
25 a little more detail with you. You'll see here that

68

1 underneath where it lists your incorrect address, Mr.
2 Lane says that you will testify as plaintiff's expert
3 on Title III of the Americans with Disabilities Act,
4 its regulations and guidelines, and their application
5 to the facilities and businesses that are subject of
6 the instant lawsuit. Is that, in fact, what your
7 expert opinion will be on?
8　　　A. Yes.
9　　　Q. Okay. Now, if you turn to the second
10 page, it says here at the top, "A final report will be
11 forthcoming upon the plaintiff undertaking an
12 inspection of the property under Rule 34," and that's
13 an abbreviation for the Federal Rules of Civil
14 Procedure. Do you see that?
15　　　A. Yes.
16　　　Q. All right. If you look down here at the
17 bottom, it says that the date this was submitted was
18 December 31st of 2013.
19　　　A. Okay.
20　　　Q. All right. At this time, you had already
21 submitted a Rule 34 report, had you not?
22　　　A. That's correct.
23　　　Q. Okay. Mr. Lane states on his own
24 information and belief that you have not provided any
25 deposition testimony within the last four years and

**69**

1 have authored no publications within the preceding ten

2 years; is that correct?

3     A. That's correct.

4     Q. Okay. Does this document contain a

5 complete statement of all the opinions you're going to

6 express in this case?

7     A. I believe so.

8     Q. What about all the topics on which you

9 will be providing expert testimony?

10     A. What do you mean, ADA topics?

11     Q. Well, it says here -- I'll read it to you

12 -- "Title III of the Americans with Disabilities Act,

13 its regulations and guidelines and their application to

14 the facilities and businesses that are subject of the

15 instant law suit."

16         MR. PURYEAR: I apologize for

17         reading so quickly. Do you need me to

18         read that again?

19         THE COURT REPORTER: No. It's

20         fine.

21         MR. PURYEAR: Okay. All right.

22     A. Well, the answer would be yes.

23     Q. Okay. Does it contain the basis and

24 reasons for the opinion you will express?

25     A. Yes.

**70**

1     Q. Where does it contain the basis and

2 reasons for the opinions you will express?

3     A. The basis is going to be in the

4 regulations and guidelines themselves.

5     Q. Okay. And what about the reasons for your

6 opinions? Does it contain those?

7     A. Again, based on the regulations and

8 guidelines.

9     Q. Okay. But isn't it more accurate to say

10 that the application of the regs and the guidelines are

11 going to be the reasons for the opinion you're going to

12 express?

13     A. They're going to be part of it, yes.

14     Q. Right. Because you're not just here to

15 tell me what the ADA says. You're here to tell me how

16 it applies to the store, aren't you?

17     A. That's correct.

18     Q. All right. It doesn't say that in this

19 document, though, does it?

20     A. It says, "Its regulations, guidelines and

21 their application to the facilities."

22     Q. Okay. And that's all it says?

23     A. "That are subject to -- of the instant

24 lawsuit."

25     Q. That's all it says; is that correct?

**71**

1     A. Which I guess is this lawsuit.

2     Q. All right. But does it provide the

3 reasons for your actual opinions?

4     A. Does it specifically state, "The reasons

5 for my opinions will be"? It does not say that in

6 here.

7     Q. All right. Does this document contain all

8 the facts and data you considered in forming the

9 opinions you're going to express today?

10     A. We're talking about the ADA regulations

11 and guidelines, yes.

12     Q. So this document right here, which is

13 three pages with the Certificate of Service, it

14 contains all the facts and data you considered in

15 forming your opinions?

16         MR. LANE: Objection.

17     A. Yes. It says the subject matter of my

18 opinion testimony will be able to -- will be to

19 identify the ADA violations on the property.

20     Q. In other cases in which you've been an

21 expert, has the plaintiff or defendant for whom you've

22 been also designated as an expert, designated

23 separately a financial expert for the case?

24     A. Yes.

25     Q. Okay. How many times has that happened?

**72**

1     A. I can't recall.

2     Q. More than once?

3     A. I can't recall.

4     Q. Okay. And the reason for that is you

5 don't have any financial training other than your

6 experience in raising capital for early start-up

7 companies; is that correct?

8     A. That's correct.

9     Q. You do not have an MBA?

10     A. I do not have an MBA.

11     Q. Have you ever taken any accounting

12 classes?

13     A. Yes.

14     Q. What accounting classes have you taken?

15     A. Basic accounting classes.

16     Q. And when did you take the basic accounting

17 classes?

18     A. I can't recall, but it's been more than

19 ten years.

20     Q. So in the last ten years, there's been no

21 accounting classes taken by you, no business degree

22 obtained by you; is that correct?

23     A. That's correct.

24         (DEFENDANT'S EXHIBIT NUMBER 10 WAS MARKED

25         AND HANDED TO THE WITNESS.)

73

1    Q. Let me show you what's been marked as
2  Deposition Exhibit 10 and ask whether or not you
3  recognize this document?
4    A. This document, I don't recall.
5    Q. Okay. Do you see where on page 3 your
6  name is listed?
7    A. I do see that.
8    Q. And you were disclosed as an expert for
9  the plaintiff in this case, which was Access for the
10  Disabled, Inc. and Denise Payne?
11    A. That is correct.
12    Q. But you don't remember being designated as
13  an expert in this case?
14    A. I don't remember that.
15    Q. Okay. Do you see on the second page where
16  Gary Paul Wachsman was disclosed as an expert?
17    A. I read that here, yes.
18    Q. Okay. Are you a licensed certified public
19  accountant?
20    A. I am not.
21    Q. All right. Do you know who David Pedraza
22  is?
23    A. Yes.
24    Q. Who is David Pedraza? P-E-D-R-A-Z-A.
25    A. David Pedraza is a ADA expert.

74

1    Q. Why would Mr. Pedraza and you both be
2  disclosed as experts in this case?
3    A. I do not know, but I did work for
4  Mr. Pedraza.
5    Q. Okay. Does he have any better
6  understanding of the ADA than you do?
7    A. I believe he might. He's had more
8  experience.
9    Q. He's had more experience than you have?
10    A. Yes.
11    Q. Okay. So even though Mr. Pedraza was
12  listed as an expert on this case, this attorney, whose
13  name is Pete Monisith, M-O-N-I-S-I-T-H [sic], still
14  felt it necessary to disclose a CPA as an expert,
15  didn't he?
16    A. I don't know what his intentions were
17  putting him on this document.
18    Q. But you do see that he disclosed a
19  separate expert to testify as to the financial ability
20  of the defendant to bring the property into ADA
21  compliance? That's what it says underneath his name,
22  doesn't it?
23    A. It says that he's a licensed CPA, yes.
24    Q. Do you know who Pete Monisith [sic] is?
25    A. He's an attorney, I guess. Yes.

75

1    Q. And do you know who Thomas Bacon is?
2    A. Yes.
3    Q. How do you know Mr. Bacon?
4    A. Mr. Bacon -- I know Mr. Bacon -- he's an
5  attorney that calls me for work from time to time.
6    Q. How long have you known Mr. Bacon?
7    A. Let's see. I can't recall how long. It's
8  been awhile.
9    Q. Okay. A couple years?
10    A. Yes.
11    Q. I mean, this case was filed in 2010.
12    A. Yeah. Definitely a couple of years.
13    Q. All right. So he's familiar with your
14  expertise?
15    A. Yes.
16    Q. Okay. Let's go back to Deposition Exhibit
17  Number 9, and you see at the bottom of page 1 where it
18  says, "The initial report of the violations existing on
19  the property is attached hereto"?
20    A. Uh-huh.
21    Q. Okay. I'll show you what's been -- if
22  you'll look in your pile for what's previously been
23  marked as Deposition Exhibit 5. This should be in
24  reverse --
25    A. Yeah. That's why I'm trying to --

76

1    Q. Yeah, it should be right behind that.
2    A. There we go.
3    Q. There you go, okay. Do you recognize this
4  document?
5    A. Yes.
6    Q. All right. Is this the initial -- is this
7  the initial report of the violations referred to in the
8  expert disclosure filed by Mr. Lane?
9    A. It is not the initial report.
10    Q. Okay. What did the initial report look
11  like?
12    A. I don't see it in this stack.
13    Q. I don't believe it is.
14    A. Okay.
15    Q. Well, what do you think it looks like?
16    A. Oh, what I think -- it's hard for me to
17  describe what a report looks like. It has paragraphs.
18  I don't -- you know, it's a report. This is a
19  checklist or what I would consider a checklist.
20    Q. Okay. Did you fill out the report you're
21  talking about at the same time you filled out this
22  checklist?
23    A. No.
24    Q. When did you fill out the report? Do you
25  recall?

**77**

1      A. I don't recall.

2      Q. Going back to Deposition Exhibit Number 5,

3 is this a document that you prepared?

4      A. That's correct.

5      Q. How did you prepare it?

6      A. I basically just, you know, prepared it.

7 I just put checkmarks and that's it, based on -- based

8 on my pictures and measurements.

9      Q. Okay. And would those be the pictures and

10 measurements that you took when you came out to meet

11 Mr. Richardson?

12      A. Yes.

13      Q. Okay.

14      A. For the initial report, yes.

15      Q. Okay. So the pictures and measurements

16 you took at Roses when you came to meet Mr. Richardson

17 formed the basis of this initial report that exists

18 somewhere and this checklist?

19      A. That's correct.

20      Q. The date on this checklist is November 9,

21 2012. Do you have any reason to believe that's not

22 accurate?

23      A. That would be the date of which I actually

24 prepared the checklist.

25      Q. Okay. And up in the top left-hand corner,

**78**

1 there's a file number.

2      A. Yes.

3      Q. What does this refer to?

4      A. It refers to a file number that is used

5 when I speak with an attorney, and it's just easier for

6 us to understand as opposed to giving me a defendant's

7 name which I may not know. It's just easier to see a

8 file number.

9      Q. So the file number here is 1615-NC? Does

10 that mean that this is the 1,615th checklist you've

11 filled out for North Carolina?

12      A. No.

13      Q. Does that number have any relevance?

14      A. It does not, except for the North Carolina

15 portion.

16      Q. Okay. All right. And the address on here

17 states it's the Roses at the Village Shopping Center

18 which is the Roses at issue in this dispute, is it not?

19      A. That's correct.

20      Q. Okay. Now, I see out of all the possible

21 places to put checkmarks on here, there's three on the

22 first page and eight on the second; is that correct?

23      A. Eight on the second, yes.

24      Q. Okay. So let's -- so if there are no

25 checkmarks -- if a box on this particular document does

**79**

1 not have a checkmark in it, does that mean you did not

2 discover any violation with respect to that particular

3 portion of the property?

4      A. That means that I did not see any -- see

5 any particular violation at that time. This is an

6 initial report and it's not a -- it's not as

7 comprehensive as a Rule 34.

8      Q. But this is not the initial report? This

9 is just a checklist?

10      A. You're right. You're right. Yes.

11      Q. All right. Did you prepare an initial

12 report and a checklist similar to this but with respect

13 to the entire shopping center?

14      A. To the entire shopping center?

15      Q. Yeah. This is at Village Shopping Center.

16      A. Oh, yes.

17      Q. Okay. Did you prepare those at the same

18 time?

19      A. I don't recall.

20      Q. Okay. Do you still have copies of those

21 documents?

22      A. I don't recall if I have them or not.

23      Q. Do you still have a copy of this document?

24      A. I probably do.

25      Q. Okay. So let's talk about the violations

**80**

1 you did say you found. Under the "Entrance Access and

2 Path of Travel," there's a checkmark and it says,

3 "Pathway of 36 inches of clear W is not provided."

4 What does that mean?

5      A. Clear width is not provided. It's just

6 abbreviations being used because it just didn't fit.

7 Clear width.

8      Q. All right. What about under "Access to

9 Goods and Services," this first one that's "Tel.

10 controls"?

11      A. That would usually mean that the controls

12 on the telephone were greater than 48 and greater than

13 54 inches.

14      (TELEPHONE RINGING)

15      A. I believe this --

16      MR. PURYEAR: Can we go off the

17      record for a second?

18      (OFF THE RECORD AT 12:37 P.M.)

19      (BACK ON THE RECORD AT 12:37 P.M.)

20      A. This, to me, looks like a typo. I do not

21 recall there being any telephones at that -- I don't --

22 I don't recall whether there are or there aren't.

23      Q. Okay. Well, I'll submit to you that

24 there's no violation noted in your Rule 34 report with

25 respect to telephones.

81

1    A. Right.

2    Q. And Mr. Richardson says he doesn't even

3  remember if there's any telephones there, and I don't

4  remember if there's any telephones there.

5    A. And I totally agree. And that's why I

6  said --

7    Q. Okay.

8    A. -- it looks like a typo on my part.

9    Q. All right. What about "Facility doesn't

10  maintain the access. elements." What is that short

11  for?

12    A. Facility does not maintain the accessible

13  elements.

14    Q. And what does that mean?

15    A. Generally that means that -- that there

16  are accessible elements that are present that are not

17  being maintained. In other words, let's say a

18  bathroom, for instance, and not in this particular

19  case, but a typical bathroom, and you would see that

20  there's a trash can there and the maneuvering clearance

21  of the space, all right? That would be an example of

22  an accessible element that was not maintained. In

23  other words, that trash can should not be obstructing

24  the maneuvering case. It should be moved to a place it

25  doesn't obstruct. Another example would be maintaining

82

1  the 36-inch aisles, maintaining a path of travel

2  throughout the facility. That would be an example of a

3  failure to maintain the accessible elements.

4    Q. What if the curve ramp was greater than

5  8.33 percent slope? Would that be a failure to

6  maintain accessible elements?

7    A. Not unless that particular curve ramp was

8  cracked, that type of thing.

9    Q. Okay.

10    A. That would be an architectural flaw.

11    Q. So this isn't necessarily a catchall for

12  everything. You're just saying there's a part of the

13  store that's accessible but not maintained; --

14    A. That's correct.

15    Q. -- is that right? Okay. And looking at

16  this document now, do you have any idea why you checked

17  that particular box?

18    A. Which one?

19    Q. The "Facility doesn't maintain the

20  accessible elements." And when I ask that, I mean

21  specifically, do you know what element they weren't

22  maintaining?

23    A. I -- I believe it was the 36-inch aisles

24  was one of the examples, and I don't recall if there

25  were others.

83

1    Q. Okay.

2    A. There may have been a trash can as I -- as

3  in my example of the restroom.

4    Q. All right. So we're going to finish this

5  document and then we'll take a short break for lunch.

6  Is that okay?

7    A. Sure.

8    Q. All right, great. All right. So then we

9  have public restrooms. You say, "Standard stall 60 by

10  60 is not provided." Is that required under both the

11  1991 and the 2010 regulations?

12    A. Yes.

13    Q. Do you know what section of the code from

14  1991 requires that?

15    A. I don't recollect.

16    Q. It says, "Compliant grab bars are not

17  provided." What makes grab bars compliant?

18    A. There are several things that make them

19  compliant and there are several things that make them

20  noncompliant. I mean, compliant grab bars -- and it

21  depends on the situation. If you have a 60 by 60

22  stall, compliant grab bars would mean you'd have a rear

23  grab bar and you'd have a side grab bar. Rear grab bar

24  would be 36 inches. The side grab bar would be 42

25  inches mounted at certain distances from the wall, also

84

1  mounted between 33 and 36 inches from the finished

2  floor.

3    If you had a -- what's called a

4  semi-ambulatory stall, which is usually a 36-inch

5  stall, which is -- which is allowed if you have one of

6  these first, okay, and that would be -- that

7  configuration is the two sets of side grab bars without

8  the rear grab bar.

9    Q. Okay.

10    A. Also, grab bars, you know, have to be

11  structural -- certain structural strength to withstand,

12  you know, 250 pounds of pressure without breaking off

13  the wall, that type of thing.

14    Q. That would be bad. Down here at the very

15  bottom of this page, you've got a "Note" section.

16    A. Yes.

17    Q. Is it typical for you to put notes into

18  these checklists?

19    A. It can be if -- if there's a particular

20  item or element that is not exhibited here. You would

21  -- I would use that to expand upon what else was

22  discovered.

23    Q. Okay. At the time you inspected the Roses

24  for purposes of this -- I'm not talking about the Rule

25  34. We'll get to that after lunch. For purposes of

**85**

1 this, how much time did you spend performing the
2 inspection?
3     A. This particular inspection was about, I
4 would say, 30 minutes. The actual inspection?
5     Q. Correct.
6     A. In other words, me being there taking
7 pictures and --
8     Q. Yeah.
9     A. The actual inspection was about 30
10 minutes.
11     Q. Okay.
12     A. It does not include preparing the
13 checklist, the report or anything else or putting the
14 pictures wherever.
15     Q. And did you -- at the time that you
16 inspected the Roses, did you also inspect the rest of
17 the shopping center?
18     A. I don't recall if it was the same day or
19 if it was different days.
20     Q. Would your ledger reflects the days that
21 you inspected the Roses and inspected the shopping
22 center?
23     A. Yes.
24     Q. But as you sit here right now, you don't
25 recall whether it was the same day or not?

**86**

1     A. I do not recall.
2     Q. Okay. Let's take a break.
3         (OFF THE RECORD AT 12:44 P.M.)
4         (BACK ON THE RECORD AT 1:13 P.M.)
5     Q. Good afternoon, Mr. Childers.
6     A. Good afternoon.
7     Q. At the beginning of the deposition, I
8 asked you whether anything prevented you from providing
9 accurate, truthful testimony here today, and you
10 answered no. Since -- now that we're returning from a
11 break, is there anything that prevents you from
12 continuing to provide truthful and accurate testimony?
13     A. No.
14     Q. Okay. Did you speak with anyone other
15 than your attorney during the break about this case?
16     A. No.
17     Q. Okay. Did you take any medications during
18 the break?
19     A. No.
20     Q. All right. When we left off, I believe we
21 were talking about the checklist --
22     A. Yes.
23     Q. -- that you filled out upon your initial
24 visit to the store. How many other times have you
25 visited the Roses store that's at issue in this

**87**

1 lawsuit?
2     A. I don't recall. Probably two or three
3 times. Definitely two. Three. Maybe three times,
4 maybe four. I -- I really don't recall. I know it was
5 more than two, probably less than five.
6     Q. And what was the date of your last visit?
7     A. The date of the last visit was this
8 morning.
9     Q. How long did you spend in the store?
10     A. Ten minutes.
11     Q. What sections of the store did you visit?
12     A. Pretty much the majority of the store.
13     Q. Did you speak to any of the employees or
14 the store manager while you were there?
15     A. Only to respond to their hello as "hello"
16 and that's it.
17     Q. Other than the visit you had this morning,
18 what was the -- do you know the date or approximate
19 date of the visit -- the last visit before that?
20     A. No, I do not.
21     Q. Did you create any documentation relating
22 to your visit this morning?
23     A. I did not.
24     Q. Okay. Have you created any documentation
25 related to your visits to the Roses store other than

**88**

1 the initial report, the initial checklist in your Rule
2 34 inspection?
3     A. That's it.
4     Q. If you would, pull out Deposition Exhibit
5 Number 6 from your stack, Mr. Childers.
6     A. They're out of order. Okay, 6.
7     Q. There you go.
8     A. Okay.
9     Q. Do you recognize this document?
10     A. Yes.
11     Q. And is this the Rule 34 inspection report
12 we've been referring to?
13     A. Yes, sir.
14     Q. My copy has 51 pages. Does yours have --
15 and they're numbered. The last page is numbered 51.
16 Is that the same --
17     A. Yes.
18     Q. -- for yours?
19     A. Yes.
20     Q. Okay. And is this a pretty standard Rule
21 34 report?
22     A. Yes.
23     Q. Okay. There's nothing atypical about
24 this?
25     A. Currently, yes.

89

1   Q. Currently, okay. Describe for me how one
2   determines which version of the ADA applies.
3   A. You're talking about between 1991 and
4   2010?
5   Q. Sure.
6   A. The way you determine that is the 2010
7   provides certain safe harbors for things that existed
8   before that were compliant before. In other words, an
9   example would be the 2010 regs now say that the reach
10  ranges for particular items like a soap dispenser now
11  is moved down to 48 inches where the 2- -- where the
12  1991 regs stated 54 or 48, depending if it was a
13  forward approach or a side approach.
14      And so what 2010 says is that if you
15  complied with 1991 standards, in other words, those
16  reach ranges were in that range, you do not have to
17  move them now from 54 inches down to 48. So in other
18  words, you're safe harbored. It then goes on to say
19  that if you did not comply with 1991, now you must
20  comply with 2010.
21      In other words, when you -- when you move
22  -- when you move that soap dispenser down now, it must
23  be 48. You can no longer use the 1991 of 54, so you
24  don't really get to pick and choose. And that really
25  decides -- the violation of the 1991 standard is what

90

1   triggers that you have to move forward to the 2010
2   standards.
3   Q. So if a bathroom, let's say, had not been
4   remodeled since 1991, the applicable ADA regulations
5   for that bathroom would be the 1991 regulations and not
6   the 2010 regulations?
7   A. That is correct.
8   Q. Okay. And is that true for all aspects of
9   the ADA, all aspects of Title 3 of the ADA, just so
10  we're clear?
11  A. It would be true, but also 2010 addressed
12  new things that had never been scoped before, amusement
13  rides and so forth and those things. So in that case,
14  there isn't -- there isn't a safe harbor. You just
15  have to comply with 2010. So any additional scoping
16  would have to apply with 2010, so.
17  Q. And there's no additional scoping that
18  would apply in this particular case because retail
19  stores were covered under the 1991 regulations; is that
20  correct?
21  A. That would be correct.
22  Q. Okay. So nothing in the store was in
23  violation -- nothing in this store, this Roses store,
24  had been modified since 1991 and was not in violation
25  with the code of 1991, then there would be no ADA

91

1   violation at this store; is that correct?
2   A. That's correct.
3   Q. Okay. What -- is there any kind of a
4   black-line rule about what constitutes a modification
5   sufficient to trigger the 2010 standards?
6   A. It's usually element by element. In other
7   words, the mirror is too high, okay? Now, in this
8   case, the -- the mirror -- a bad example because they
9   stayed the same. They were -- they were -- you know,
10  the soap dispenser is a better example. In that case,
11  you know, that would trigger the element by element.
12  In other words, if the rest of the bathroom was -- if
13  the rest of the bathroom was compliant and that soap
14  dispenser was too high -- if it was compliant with 1991
15  and that soap dispenser was too high, you would have to
16  move the soap dispenser, but you would not have to move
17  everything else --
18  Q. In the bathroom.
19  A. -- in the bathroom, okay? It only applies
20  element by element. That being said, if you were to
21  take that same bathroom and let's say the problem was
22  the stall was too small, and you rip out stalls and you
23  -- and you move plumbing and so forth and so on, that
24  becomes a major renovation, and then you would have to
25  bring up the entire restroom to 2010 standards. And

92

1   that -- that's kind of like the line that you were
2   asking for.
3   Q. So, I mean, was it demo work or --
4   A. Well, ripping out -- ripping out
5   partitions and so forth and moving plumbing, yeah, I
6   would consider that major.
7   Q. Okay. So if there's major -- if there's
8   major modification to an element of the facility, --
9   A. It becomes an alteration.
10  Q. -- then it becomes -- so that's the test,
11  if there's an alteration?
12  A. Yes.
13  Q. Now, if you make an alteration to a
14  bathroom, does that require you to bring the remainder
15  of the store up to 2010 standards?
16  A. In this -- in your for-instance, no. It
17  would just be the bathroom. Wherever you --
18  Q. It would just be the bathroom?
19  A. Right.
20  Q. And if you made alterations to the men's
21  restroom, would that require you to bring the women's
22  restroom into 2010 standards?
23  A. I don't believe so.
24  Q. Okay. Now, why -- what do you mean when
25  you say you don't believe so? That's your expert