**93**

1  opinion?

2      A. That would be my expert opinion because

3  it's -- again, that major alteration was confined to

4  that one restroom.

5      Q. Okay. So there's some -- you have this

6  alteration test and then some kind of proximity test

7  that sort of cabins off the amount of 2010 regs you

8  have to meet? Or maybe -- maybe a better way to put it

9  is when you make an alteration to one particular

10  element of the facility, that element and all of its

11  subelements, --

12      A. Uh-huh.

13      Q. -- right, like a men's room and then

14  everything in the men's room, would have to come up to

15  the 2010 standards, but everything outside of that

16  element would not?

17      A. Correct.

18      Q. Okay. If you would, I would like to go

19  through this report with you and ask -- we've covered

20  what formed the basis of your opinions in this report,

21  and I believe your testimony has been your visual

22  inspection of the premises and your understanding of

23  ADA regulations; is that correct?

24      A. That's correct.

25      Q. Okay. And your testimony earlier was that

**94**

1  you had not reviewed any of the documents that Variety

2  had produced in discovery prior to or after submitting

3  this report, other than you glancing in the white

4  notebook at dinner last night; is that correct?

5      A. That's correct.

6      Q. Okay. So then that would mean -- sorry.

7  Strike that.

8          Okay. If you would turn to page 3 of the

9  report. In the second paragraph you say that "On

10  Thursday, August 8th, 2013, an ADA compliance

11  inspection was conducted by Chuck Childers acting as

12  expert for the plaintiff, accompanied by counsel and

13  representatives of the defendant at the properties."

14  Did I read that correctly?

15      A. Yes.

16      Q. Okay. So you mentioned that you had been

17  to the store since this occasion at least once, which

18  was yesterday?

19      A. Yes.

20      Q. Do you recall going to the store any other

21  occasions between this August 8th, 2013 visit, and your

22  January 30th, 2014 visit?

23      A. No, I do not.

24      Q. Okay. Where you say that you were

25  accompanied by counsel and representatives of the

**95**

1  defendant at the properties, this isn't entirely

2  accurate, in my opinion, Mr. Childers. I assume when

3  you say representatives of the defendant, you're

4  referring to me and to the store employee that

5  accompanied us around -- accompanied you around the

6  premises; is that correct?

7      A. Actually, I was referring to yourself.

8      Q. Okay. So just me?

9      A. Right.

10      Q. One representative?

11      A. Right.

12      Q. But the fact of the matter is, while I did

13  walk around with you for most of the store, when you

14  and Mr. Lane inspected the bathrooms, I did not go into

15  the bathrooms with you. Do you recall that?

16      A. I believe you did not go to the bathrooms,

17  yes.

18      Q. Okay. But for the remainder of the

19  inspection, other than when you and Mr. Lane wanted to

20  have a private conversation, I was -- I was there; --

21      A. Yes.

22      Q. -- is that accurate?

23      A. That would be accurate.

24      Q. Okay. All right. In the next paragraph,

25  you say that "The estimated cost to correct

**96**

1  noncompliant elements are provided where applicable.

2  In determining costs, reference is made to local

3  contractor pricing and does not include architectural

4  plans and permits." What do you mean by local

5  contractor pricing?

6      A. In other words, part of the -- one of the

7  factors that I use to determine is, you know, different

8  pricing is -- is local contractor pricing. I look for

9  local general contractors to try to get to a ballpark

10  on what it would take to remove this particular

11  barrier.

12      Q. Now, earlier in your deposition, you

13  mentioned this use of MS Means data --

14      A. Right. Construction data.

15      Q. Would that reflect the local contractor

16  pricing, or is that in addition to the local contractor

17  pricing?

18      A. I would say it would be in addition. It's

19  just another resource that I use.

20      Q. Okay. And so the amounts of money that

21  you list next to the modifications we're going to

22  discuss refer to the cost it would be from looking at

23  the local contractor pricing to make your suggested

24  modifications; is that correct?

25      A. That's correct.

**97**

1  Q. Okay. Is there anything else that you
2  would reference in determining the costs associated
3  with each modification other than the local contractor
4  pricing and the MS Means data?
5  A. Also I would -- I would sometimes confer
6  with other experts.
7  Q. With this particular case, have you
8  conferred with any other experts?
9  A. In this particular case, I have not.
10  Q. If you turn the page to page 4 -- and
11  we're going to take this report one step at a time.
12  You say here under the section entitled "Interior Path
13  of Travel," there's a subpoint A, and you say that "The
14  checkout counter does not provide signage containing
15  the ISA, which is in violation of 7.3 subsection 3 of
16  the 1991 ADA accessibility standards," correct?
17  A. Correct.
18  Q. Under Section 216.11 of the 2010
19  standards, does it not state that signage is not
20  require -- not required when all counters in a retail
21  store comply with Section 904.3?
22  A. If they do comply, if they're all
23  accessible, then, yes, you don't -- it's not required.
24  Q. Okay. So in order to determine whether or
25  not they're all required, you'd have to measure the

**98**

1  height of the counter; that's the technical requirement
2  under the ADA, is it not?
3  A. No. It's one of the measurements you
4  would use. It's also the width between the counters
5  and so forth.
6  Q. Okay. And your report doesn't include the
7  measurement of the height or the width, does it?
8  A. No, it does not.
9  Q. In Section B, you state that "The
10  women's clothing department -- in the women's clothing
11  department, the accessible route is reduced to less
12  than 36 inches wide, violating Sections 4.3.3 and
13  36.211 of the 1991 standards," correct?
14  A. That's correct.
15  Q. Now, under both the '91 -- well, no,
16  strike that.
17  Under the 2010 standards, it is
18  permissible to have your route reduced to less than 36
19  inches, is it not?
20  A. For a two-foot period -- for a two-foot
21  distance --
22  Q. Correct. It can reduced to 30 --
23  A. -- to 20 --
24  Q. -- 32 --
25  A. -- to 24 inches.

**99**

1  Q. I apologize. So for a two-foot distance,
2  it can be --
3  A. I'm sorry. I'm sorry. Right, 32 inches.
4  Q. Okay. So let's back up so she doesn't
5  kill us.
6  A. Right.
7  Q. I want to go home today.
8  A. For a two-foot length, 32 inches.
9  Q. Okay. Are there any other requirements
10  related to the reduction?
11  A. Not -- not that -- not that I can
12  remember.
13  Q. Now, when you visited this Roses for this
14  inspection, did you also inspect the men's clothing
15  department and the children's clothing department?
16  A. I believe I -- I walked around the store.
17  Q. Well, I appreciate that, but my question
18  was did you --
19  A. And I believe -- I believe --
20  Q. Let me finish my question. Just --
21  A. Yes.
22  Q. Okay. All right. So my question was did
23  you inspect the men's clothing department and the
24  children's clothing department?
25  A. Yes.

**100**

1  Q. Okay. Your report, though, -- and if you
2  need a second to flip through -- it does not reflect
3  that you found any violations with respect to those
4  sections?
5  A. That is correct. I did not point out
6  every particular aisle and every particular instance of
7  where this particular thing occurred. It was more of a
8  sampling, if you will, of what this particular
9  violation looks like and examples of that.
10  Q. Okay. But this -- in your report, you
11  refer specifically to the women's clothing department,
12  do you not?
13  A. As a -- as a definition of where these
14  pictures were taken.
15  Q. Okay.
16  A. As a location --
17  Q. Right.
18  A. -- descriptor, if you will.
19  Q. Okay. And there is no specific reference
20  to either the men's clothing department or the
21  children's clothing department in this report, is
22  there?
23  A. That is true.
24  Q. Okay. Now, the complaint here is that --
25  and I'm looking, you know, for instance, in the --

101

1 there are -- there are six pictures under Section B.
2 I'm looking at the first one at the top left corner,
3 and what I see, what -- what looks like what I'll call
4 round racks of clothes. Do you see that?
5     A. Yes.
6     Q. The one on the left looks like it's a
7 2-for-10 deal, and the one on the right is the same;
8 it's just called 5 bucks, right?
9     A. Right.
10     Q. So do I understand that your opinion is
11 that there's not an accessible route of 36 inches in
12 between these round racks?
13     A. That is correct.
14     Q. Okay. Now, the recommendation -- and --
15 and -- strike that.
16     And what you said earlier was this was
17 just a sampling. Do you believe that this problem,
18 this route of less than 36 inches, actually exists
19 between all the round racks in the women's clothing
20 department?
21     A. I wouldn't know.
22     Q. You wouldn't know. Because it's not in
23 your report; is that correct?
24     A. That's correct.
25     Q. And you are not able to recall, as you sit

102

1 here today?
2     A. That is correct, although --
3     Q. And you --
4     A. -- in this -- in your first picture that
5 we referred to, there is a measurement of that, which
6 is in the next picture.
7     Q. Correct. And it appears --
8     A. Correct.
9     Q. -- to be 32 inches?
10     A. I can't -- I can't -- I can't read it.
11     Q. I -- it's difficult as well. This is the
12 report that I received from --
13     A. Okay.
14     Q. -- from Mr. Lane, so.
15     A. I'd have to blow it up to see what it is.
16 I really --
17     Q. Now, your recommendation with respect to
18 the women's clothing department is to relocate the
19 merchandise and to create a policy to maintain the
20 accessible features of the facility as required in
21 Sections 4.03.5.1 and 36.211; is that correct?
22     A. Yes.
23     Q. Okay. If you'd flip to the -- let's see
24 here. If you'd flip to page 15 of your report, --
25     A. Okay.

103

1     Q. -- you have a section that's called "ADA
2 Standards Cited Within This Report"; is that correct?
3     A. That's correct.
4     Q. It appears to me that these sections that
5 you've included as a part of your report -- I take it
6 back. Strike that.
7     And so is the section that you're -- do
8 you see Section 403.5.1. as a part of this report?
9     A. I'm sorry. Say again.
10     Q. Sure. You reference 403.5.1.
11     A. Okay.
12     Q. And I see on page 18 -- this isn't a trick
13 question. I --
14     A. Uh-huh.
15     Q. -- I'm just trying to make sure I got it
16 right. I see where Section 36.403 is included.
17     A. Uh-huh.
18     Q. But do you see Section 403.5.1 included as
19 a part of your report?
20     A. Okay. No. The -- the 2010 standards are
21 not cited in this report.
22     Q. Okay. So if you go back to page 5 -- is
23 that correct?
24     A. Yes. I don't know.
25     Q. In the recommendations -- sorry -- page 4.

104

1     A. Okay.
2     Q. In the recommendations, you cite the
3 Section 403.5.1 of the 2010 ADA standards, do you not?
4     A. Yes.
5     Q. Okay. So what you've done is you've only
6 included the 1991 standards. Your report actually
7 doesn't include the 2010 standards for reference; is
8 that right?
9     A. That's correct.
10     Q. Okay. 403.5.1, as I understand it, is the
11 section we were just talking about that requires that
12 there be an accessible route of travel that is 36
13 inches; is that correct?
14     A. I don't have my book in front of me, so --
15     Q. Okay. So you don't know off the top of
16 your head?
17     A. I don't -- I --
18     Q. That's fine. I -- listen, I'm not --
19     A. Right.
20     Q. -- this ain't a memory test.
21     A. I haven't memorized all the -- all the
22 different numbers and just --
23     Q. All right. When I look at the 2010 ADA
24 standards, what 403.5.1 says, in my book, is "Clear
25 width. Except as provided in 403.5.2 and 403.5.3, the

**105**

1 clear width of walking services shall be 36 inches
2 minimum." Does that sound accurate, --
3     A. It does sound --
4     Q. -- to the best of your recollection?
5     A. It does sound accurate.
6     Q. Okay. All right. And then it has this
7 exception that we talked about where "The clear width
8 shall be permitted to be reduced to 32 inches, minimum,
9 for a length of 24 inches, maximum" -- and this is the
10 part you left off, which is that -- "provided that the
11 reduced width segments are separated by segments that
12 are 48 inches long, minimum, and 36 inches wide,
13 minimum." Does that sound accurate?
14     A. Yes.
15     Q. Okay. So this report doesn't capture all
16 of the particular measurements that are listed in the
17 exception of 403.5.1, does it?
18     A. It does not depict those measurements;
19 that's correct.
20     Q. Okay. You say here to relocate the
21 merchandise in the women's clothing department.
22 Praytell, where -- where would you relocate that
23 merchandise?
24     A. It's not a matter of relocating the
25 merchandise. It's a matter of relocating the stands to

**106**

1 create that 36-inch path.
2     Q. Okay. Now, you were just in the store a
3 couple hours ago, correct?
4     A. Yes.
5     Q. And you've been in the store, you said, on
6 three to four other occasions?
7     A. Right.
8     Q. You created this Rule 34 inspection report
9 where you went in and you took specific measurements?
10     A. Correct.
11     Q. You created an initial inspection report
12 from the first time you went and that -- that
13 checklist?
14     A. Yes.
15     Q. At any time, have you seen a store layout
16 for this particular store?
17     A. No, I have not.
18     Q. Okay. Can you tell me how many square
19 foot -- excuse me -- how many square feet are located
20 within the women's clothing department?
21     A. No. I was not provided with that
22 information.
23     Q. And -- and so you have not had a chance to
24 -- strike that.
25     You were in the store and you took

**107**

1 measurements, didn't you?
2     A. Yes.
3     Q. So you had the opportunity to take those
4 measurements if you had wanted to?
5     A. Of the entire store layout?
6     Q. Correct.
7     A. I guess I could have.
8     Q. Okay. From your --
9     A. Or I could have probably requested a site
10 layout.
11     Q. You could have, right.
12     A. Correct.
13     Q. Okay. So from your visits in the store,
14 do you recall how there are -- do you recall seeing
15 blue tape on the floor to delineate main aisles of the
16 store?
17     A. For the main aisles, yes.
18     Q. Okay. If those main aisles are the
19 minimum that's allowed under the ADA, and the blue tape
20 defines the area around each of the departments,
21 hypothetically speaking, --
22     A. Okay.
23     Q. -- okay? And in the women's department,
24 they have these round racks where there's not compliant
25 36 inches' width, regardless of whether it's 1991 or

**108**

1 2010, --
2     A. Uh-huh.
3     Q. -- okay? In that particular situation,
4 there is nowhere to relocate those particular round
5 racks. The only choice that Variety would have would
6 be to remove them, would it not?
7     MR. LANE: Objection.
8     A. I wouldn't know that. I mean, it --
9 logically, it would seem to me, based on visual, what
10 I've -- what I observed, that they could redesign the
11 existing area with those round racks to where they
12 could create a 36-inch path.
13     Q. So you believe, based upon your visual
14 inspections, that it would be possible to redesign the
15 women's clothing department without a reduction in the
16 number of actual racks of merchandise that would be in
17 that department?
18     A. That's what I believe upon visual.
19     Q. Okay. And that's only upon your visual
20 because you just stated that you did not take any
21 measurements of the actual women's department on your
22 visit to this particular store; --
23     A. That is correct.
24     Q. -- is that correct?
25     A. Yes.

**Page 109**

Q. Okay. Would the same be true for the men's section?

A. The same would be true for the men's section.

Q. And would the same be true for the children's section?

A. I think in the children's section we're not talking about round racks. We're talking about physical aisles. We're --

Q. Assuming, then -- okay. Assuming that all three departments are the same -- let --for just this--

A. Let's assume they're round racks; is that what you're referring?

Q. Yeah. Well, let's assume -- I mean, let's assume that they're round racks. Let's assume that they're square racks or four-ways, and let's assume that there is a finite amount of space in these sections before you create ADA compliance issues elsewhere.

A. Uh-huh.

Q. What you're saying is that without having done any measurements, and only upon your visual inspection of the store, the last of which was ten minutes for the entire store, you -- your expert opinion is they would be able to redesign those

**Page 110**

sections of the store such that they would not lose any round racks and be able to meet all the elements of the Americans with Disabilities Act under Title 3?

A. I --

MR. LANE: Objection.

A. I believe that there is a way of doing that, yes.

Q. But that's only based upon your visual inspection?

A. That is correct.

Q. If there was not a way to do it, okay -- let's -- let's say that your visual inspection was incorrect, --

A. Uh-huh.

Q. -- and that the actual measurements of that particular section would require Variety to remove a percentage of those round racks, what would be necessary to determine whether or not the modification that would be required would constitute a readily achievable modification underneath the statute?

A. That was a long question.

Q. Sure. I can rephrase it, if you'd like me to.

A. Would you rephrase it and maybe break it down?

**Page 111**

Q. Sure. Okay. So the hypothetical is we're going to lose some round racks, all right?

A. Maybe.

A. No, no, no. For the purposes of this hypothetical, --

A. Okay.

Q. -- it's we're going to lose them, okay? I'm not saying that that's the case. I'm just -- for the -- for the purposes of you and I talking. I understand you dispute that and I'm not --

A. Okay.

Q. -- there's not a catch here.

A. All right.

Q. So we've looked at it. We've measured it. We've measured the round racks. We've measured the size of the clothes on the round racks. We've contemplated the seasonal variations and the size of the clothes on the round racks. Who knows what else is in there. We came down to the determination that in order for there to be a 36-inch path of travel in between all of these racks of clothing, we are going to have to remove a certain number of racks, okay? So my question is how would you determine what modifications to that section of the store are readily achievable under the ADA?

**Page 112**

A. The question on your hypothetical, with these round racks, was it considered when you -- when you said they have -- we definitely have to get rid of some of them, was one of the items considered of maybe doubling the round racks, thereby, not needing as many of them, thereby, you know, having more space? Is that considered in your hypothetical?

Q. So you're saying that one of the potential modifications -- let's -- let's rephrase the question that I have, okay?

If you came to Variety and you said, "You're going to have to -- you can't keep the racks in this configuration," and they said to you, "Well, there's no other configuration we have with these racks that would make a 36-inch path of travel," what modifications would you suggest to them as fiscally responsible modifications?

A. So the question is there is no -- it doesn't exist on planet Earth that there's -- there is no way of designing a different type rack or -- or that existed, that different type of rack which would accommodate that; is that --

Q. Correct.

A. -- part of the question? Okay. So there's no way possible, regardless of what you did,

**113**

1 okay, that -- in that particular case, okay, there are
2 exceptions to where you can -- there are exceptions to
3 where it does state in the regs that they are not --
4 the facility is not required to lose merchandise space.
5 Primarily, and it's been a long time, but as I remember
6 that section, I think it was referring to -- I
7 shouldn't even mention it because -- it's was referring
8 to reach ranges. In other words, the reason why all
9 merchandise is not mandated to be 54 inches and 48
10 inches high and that you can have merchandise higher
11 than that is because of that same reasoning that you're
12 -- that you're stating now.
13    Q. Okay.
14    A. Okay. But I could be wrong on that
15 recollection. Maybe it does apply to floor stuff.
16 It's just been a long time since I visited that part of
17 it.
18    Q. Okay. So underneath the definition of
19 what constitutes discrimination of the ADA, does it say
20 anything about -- and I'm going to come back to what
21 you just talked about, but I just want to make sure --
22 make sure we're on the same page here. Does it say
23 anything about what a defendant would have to do if
24 there was not a readily achievable modification?
25    A. No, he doesn't have to do anything. Under

**114**

1 -- under -- under 1991 barrier removal, no. If it's
2 not readily achievable, he's not required. He's only
3 required to remove barriers that are readily
4 achievable.
5    Q. All right. So you're my expert and I've
6 said, "I've got this problem." And you say, "P.J.,
7 there's no way to rearrange these racks." And you've
8 asked me, "Are there any other racks you can buy?" And
9 I say, "Well, there are no other single-layer racks out
10 there that would satisfy the problem I have, which is
11 I'm going to lose merchandise space, you know, which is
12 going to cause me to lose profit."
13    A. Uh-huh.
14    Q. One of the modifications that you
15 suggested was for me, as the store owner, to look and
16 see whether or not there would be double racks; is that
17 right?
18    A. Right.
19    Q. So like two layers of clothing?
20    A. Uh-huh.
21    Q. And to your knowledge, there's no
22 violation of the ADA in terms of having merchandise
23 that's out of reach of someone that may be confined to
24 a wheelchair; is that correct?
25    A. That is correct.

**115**

1    Q. Okay. And I say, "Well, you know, my
2 store only made $100,000 last year and for me to go and
3 replace all the racks in the women's department, you
4 know, and I've got the same problem in the men's
5 department, is going to be $100,000." Is that a
6 fiscally responsible modification?
7       MR. LANE: Objection.
8    A. Well, I would have suggested we don't need
9 to remove all of your existing ones. We probably only
10 need to buy a couple of the double-height ones just to
11 give us the room for the 36 inch, and we're probably
12 not looking at anywhere close to a $100,000 for these
13 type of racks. I really don't know what they cost, but
14 I can't imagine that they would even approach that
15 number.
16    Q. So if a store -- and I understand this a
17 hypothetical --
18    A. And the other --
19    Q. -- is not directly -- let me finish.
20    A. Sure.
21    Q. I understand this hypothetical is not
22 directly applicable because we're talking about one
23 store right now.
24    A. Uh-huh.
25    Q. But, you know, if a store only makes --

**116**

1 let's say my store -- well, take -- go back to Bob's
2 Restaurant. It only makes a $100,000 a year, okay?
3 That's his total income before taxes, $100,000. What
4 opinion would you provide to Bob about which
5 modifications are readily achievable under the ADA?
6       MR. LANE: Objection.
7    Q. Is there any kind of line, you know, a --
8    A. It's the same as we discussed earlier.
9 Readily achievable has the two prongs. One is
10 financial ability to fix the problem, okay?
11    Q. Right.
12    A. If they don't have the financial ability
13 to fix the problem, then they don't have to remove that
14 particular barrier.
15    Q. And how would you determine whether or not
16 -- if I'm Bob's Restaurant, okay, whether I had -- and
17 I make a $100,000 a year before taxes as a business,
18 how would you -- what would you tell me I can
19 financially afford?
20    A. It -- it's -- it's -- it's more than just
21 looking at an income statement. You've got to look at
22 the cash flow. You've got to do a cash flow analysis.
23 You've got to look at the balance sheet, see what cash
24 they have on hand to make that determination.
25    Q. Going back to your report -- looking at

117

1 page 4 again, --

2     A. Okay.

3     Q. -- and I know it's kind of hard to see,

4 but, I mean, I think if you look at the picture in the

5 bottom left-hand corner, you've got what looks like the

6 bottom of a rack, and it looks like that it's --

7 there's no wheel on that rack, right?

8     A. Okay. Are we talking about paragraph D?

9     Q. No, we're still on -- on --

10     A. Oh, on 4.

11     Q. -- we're still on B on page 4.

12     A. Oh, I'm sorry.

13     Q. It's all right.

14     A. All right.

15     Q. Okay. And the picture in the bottom

16 left-hand corner, you've got the measuring tape and

17 what looks to be the base of one of these racks, and it

18 doesn't appear that there's any kind of wheel or

19 anything on the rack. Would you agree?

20     A. I can't tell by the picture.

21     Q. Okay. Well, let's -- let's assume that

22 there's not.

23     A. Okay. We'll assume that.

24     Q. You know, would -- would one -- you said

25 earlier that a part of what you do for both -- I mean,

118

1 for defendants, I guess, for companies, is tell them

2 what their options are?

3     A. Yes.

4     Q. In other words, that even while in this

5 particular report, you -- you have recommendations,

6 plural, you've really only got one recommendation

7 relating to the actual placement of the merchandise,

8 which is to relocate it. But, in fact, there may be

9 other potential modifications that would meet the ADA

10 standard, would there not?

11     A. Yes.

12     Q. So would one -- for instance, in this

13 particular case, if -- if I as the store owner said,

14 "You know what, Chuck, I don't want to deal with buying

15 double racks and having to have employees up on ladders

16 to try and fill merchandise; would it be possible for

17 me to put my racks on wheels so that employees could

18 assist customers to roll them out of the way," would

19 that potentially be a modification that would satisfy

20 the ADA?

21     A. It would be a temporary solution. In

22 other words, you can put signs in your store, "Please

23 ask for assistance if you need assistance." It's what

24 we would consider a temporary solution. It would not

25 be what I would consider a permanent solution.

119

1     Q. And explain to me what the difference is.

2 I mean, I know what the difference is between a

3 temporary and a permanent solution, --

4     A. Right.

5     Q. -- but what -- what makes you consider

6 this to be a temporary solution?

7     A. No, I said -- I didn't say it would be. I

8 just said it could be.

9     Q. It could be.

10     A. Right.

11     Q. Okay. So then it could be a permanent

12 solution as well?

13     A. Just like an example also is -- and when I

14 say temporary, I mean these fixes don't have to occur

15 overnight. These fixes can be done, you know, over a

16 period of years, --

17     Q. Uh-huh.

18     A. -- okay, with a -- with a proper plan in

19 place to where, okay, we're doing it -- we're budgeting

20 X amount of dollars this year to do this, X amount of

21 dollars to do this this year. So in a period of three

22 years, you're done. Budgeted out, it doesn't have to

23 be overnight. It doesn't have to break the bank. It

24 doesn't have to put you out of business.

25     Q. Let's go back to our -- to the

120

1 hypothetical here. What we're talking about, though,

2 is selling space reduction. And you've told me that

3 under the ADA, though you didn't say for sure because

4 you didn't want me to quote you on it because you

5 didn't remember, but it was possible that as a retail

6 store owner, I could avoid complying because the

7 modification would result in a loss of selling space.

8 Let's assume that's what it says here for a second.

9     A. Okay.

10     Q. And I say, "Chuck, you know, not only -- I

11 mean, I'm glad to hear that there's this exception

12 because if I lost" -- you know, let's say that I've got

13 to remove 20 percent of my round racks and you've

14 looked at my cash flow and my budgets and I could show

15 you, look, you know, instead of making $100,000 a year,

16 I'm actually only going to make like 40,000 or 50,000

17 bucks. It's going to take away 50 percent of my

18 profitability, right?

19     A. Uh-huh.

20     Q. I can't -- I can't afford that. That's a

21 substantial loss, wouldn't you agree?

22     A. Yes. That would be -- in that particular

23 example, it would be a substantial loss and basically

24 an undue burden.

25     Q. And so --

121

1  A. That being said, in your same
2  hypothetical, I mean, I just can't imagine -- we're not
3  talking about double-tier racks that are ten feet high.
4  We're talking about what you see in Kmart, and maybe
5  even this store has it. I don't remember. But we're
6  talking about one -- one tier is at eye level and the
7  other tier -- and most of the time you see them in
8  kids' -- in kids' areas because the clothing is smaller
9  and so forth and you've got shirts and so forth. So it
10  seems to me that there should be some design, some way
11  of configuring this to where you could make everybody
12  happy and accommodate both worlds.
13      But in your example, if, for some chance
14  there was no way on the planet, okay, of making that
15  happen, then you're right, and if it was affecting your
16  cash flow that much, in my opinion, it would be an
17  undue burden.
18      Q. Okay. So my choices would be I can spend
19  the money and go buy some double racks and work to
20  create, you know, something that would comply with
21  403.5.1 and its exceptions, correct?
22      A. To create a more user-friendly
23  environment, yes.
24      Q. Okay.
25      A. And not really so much -- it's called

122

1  universal design. Not so much -- I mean, in this case,
2  we are talking ADA, so we're talking about people with
3  disabilities. But also people, you may have noticed,
4  are gaining weight, maybe myself. It's easier to get
5  around in spaces that are -- that are, you know, at
6  least 36 inches wide. So I think it accommodates a lot
7  of people.
8      Q. Do you know why people shop at Roses?
9      A. I've never asked anybody why they did.
10  I've shopped at Roses.
11      Q. Okay. Okay. Let's go to Section C on
12  page 5. It seems to be a pretty -- I can't read the
13  measurement again in your report that was provided to
14  me, but you state that the accessible route is reduced
15  to less than 36 inches in the bedding department; is
16  that correct?
17      A. Yes.
18      Q. Now, if you look at the picture on the
19  left, you can see where the rows of the store appear to
20  end next to the bedding department. Would you agree
21  that I'm accurately describing that image? I mean, it
22  looks to me like there's one -- there's a couple of
23  aisles running to the left of the picture. Do you see
24  that?
25      A. I would be guessing. There could be.

123

1  There could not be. I can't tell from this picture.
2      Q. Okay. Well, if that, in fact, was the
3  case, as we discussed about the exception to 403.5.1,
4  it's possible that the accessible route could be
5  reduced to less than 36 inches so long as that
6  particular space was no deeper than 24 inches; is that
7  correct?
8      A. That's correct.
9      Q. Okay. And it doesn't appear that you've
10  measured the depth of the ends of each of the aisles?
11      (CELL PHONE RINGING)
12      A. Sorry. Let me turn this off.
13      Q. That's okay. As I was saying, it doesn't
14  appear in your report that there's any measurement with
15  respect to the width of the racks that are in the
16  picture on the left; is that right?
17      A. No. There's not any actual measurements
18  there, but visually I was able to see that it was
19  greater than two feet.
20      Q. So if Variety -- assuming that there was a
21  violation, if Variety widened this particular aisle to
22  36 inches, then it would comply with Section 403.5.1
23  and 36.211 of the 2010 and ADA standards; is that
24  correct?
25      A. If they were to move it and if they were

124

1  to maintain it. In other words, not move it back or
2  put additional displays in the way, then that would be
3  correct. I mean, the most important thing with this is
4  about maintaining. Once you make it accessible,
5  maintain it. In other words, you know, keep it
6  accessible. So, as you know, things in stores move.
7  They just do. On their own sometimes, and they just
8  move. Employees move them from time to time, and so
9  you really have to be on top of maintaining the
10  accessibility of your particular facility. After all,
11  you spent the time and effort to make it accessible.
12  You know, part of the responsibility is to maintain the
13  accessibility.
14      Q. So in other words, looking at the
15  recommendation, if Variety were to relocate the
16  merchandise stands and to create a policy to maintain
17  the accessible features of the facility, then it would
18  satisfy Sections 403.5.1 and 36.211 of the 2010
19  standards?
20      A. If they created the policy and enforced
21  it, yes.
22      Q. Okay. But that's not listed in your
23  recommendations, is it?
24      A. Well, it's talking about -- well, creating
25  a policy -- 36.211 is in my recommendations. Oh -- oh,

**125**

1 I see what you're saying. Creating a policy, okay.
2 Yes. To be more accurate, we should probably put "to
3 enforce it." But creating a policy to maintain it,
4 we're assuming that you're going to, once you create
5 the policy, like you do with health and resource
6 policies with employees, you enforce them.
7 　　Q. Okay. In -- let's move to Section D. You
8 say, "In the children's department, the accessible
9 route is reduced to less than 36 inches." And what
10 appears here to me is a ceiling support beam in the
11 middle of the aisle.
12 　　A. Uh-huh.
13 　　Q. Now, you can't tell from this picture, but
14 if the aisle is 60 inches wide and less than 50 feet
15 long on either side of the pole, would there be a
16 violation of the ADA with respect to the pole
17 placement?
18 　　A. Less than 50 feet wide? I don't
19 understand.
20 　　Q. Well, under the ADA, at least my reading
21 of it, --
22 　　A. Okay.
23 　　Q. -- you've got to have turn-around points
24 that are accessible to people in wheelchairs within a
25 certain amount of feet.

**126**

1 　　A. Yes, a turning space.
2 　　Q. It's like every hundred feet, I think, or
3 200 feet?
4 　　A. Right.
5 　　Q. So I picked 50. Fifty is an arbitrary
6 number less than a hundred.
7 　　A. Right.
8 　　Q. So what I'm -- what I'm asking is if Mr.
9 Richardson had the ability, based upon there being 60
10 inches of width in this picture, in this aisle, to turn
11 around when he met the pole, go less than 50 feet to
12 the end of an aisle and be able to access the other
13 side of this pole by going around the aisle that you
14 can see in the picture, would there be an ADA
15 violation?
16 　　A. No. He could actually -- he could
17 actually go around. It kind of defeats the purpose of
18 the continuous route because the ADA -- the ADA talks
19 about having that continuous 36-inch -- a continuous
20 accessible route, okay, which one of the definitions of
21 an accessible route is 36 inches except for that
22 exception for the two feet. So in that particular
23 case, I do not think it would be compliant to allow
24 this to remain the way it is.
25 　　Q. Okay. So your recommendation here is to

**127**

1 relocate the merchandise stands and satisfy 403 and
2 36.211. If Variety moved these merchandise stands to
3 either allow for 36 inches for a width of somewhere
4 between 32 and 36 inches and maintained and enforced
5 this policy you speak about, they would comply with
6 Sections 403 and 36 of the 2010 standards, would they
7 not?
8 　　A. 403, yes.
9 　　Q. Okay. And a part of the reason that you
10 can say yes is because you can see by looking at the
11 pole -- you don't have the measurement, but even I can
12 visually inspect this pole and tell you it's not 24
13 inches deep, right?
14 　　A. Uh-huh.
15 　　Q. Okay. Is that a yes?
16 　　A. Sorry. Yes.
17 　　Q. All right. Let's go to Section E. You
18 say that the spout of the water fountain is not at a
19 required height, and I can't even see what the
20 measurement is on your ruler here. What is the
21 required height under Section 4.15.27
22 　　A. It's the same. It's 36 inches max from
23 the finished floor.
24 　　Q. To what?
25 　　A. From the finished floor to the spout.

**128**

1 　　Q. To the spout. And is that where the water
2 comes out, or is that the guard behind where the water
3 comes out?
4 　　A. No. That is the actual -- where the water
5 comes out.
6 　　Q. Where the water comes out, okay. All
7 right. You say that as a recommendation, you wanted to
8 provide a water fountain -- or you recommend Variety
9 provide a water fountain with a spout outlet of 36
10 inches above the finished floor -- maximum above the
11 finished floor in compliance with 602.4 of the ADA
12 standards; is that right?
13 　　A. Yes.
14 　　Q. So let's imagine that this spout measured
15 36 and one-half inch, okay?
16 　　A. Yes.
17 　　Q. Are there other possible modifications
18 that would cost less than $500 to fix this one-half
19 inch variable?
20 　　A. Sure. They could lower -- they could
21 lower the existing water fountain.
22 　　Q. Well, no. That's what you're basically
23 telling them to do.
24 　　A. Right.
25 　　Q. I mean, you're saying provide a water

**129**

1  fountain, but what you mean is lower the one that's
2  there.  But let's say that lowering the one that's
3  there costs 500 bucks, okay?  Hell, let's say it cost
4  250.  Are there -- you know, you say in your resume
5  that you're interested in proposing fiscally
6  responsible solutions.  So I say to you, "Chuck, this
7  thing is only half an inch high and you're telling me I
8  got to spend $250 to move it half an inch.  Are there
9  any other recommendations you can provide me?"
10       A.  Well, there are.  At least there were.  In
11  '91, there are certain tolerances.  In this particular
12  case, I know you can't read it in the picture, but I
13  think it was 37 inches, so it was an inch off.  My job
14  is to -- as I see it, is to identify the violations as
15  they exist, okay?  What happens in the real world is
16  you would discuss with Chris and say, "You know, is
17  that" -- you're going back to your example of the half
18  inch -- "is that really so important?"  And it's kind
19  of a give-and-take, is what I've seen in the past.  And
20  some things are argued that it's not readily
21  achievable.  Some things are argued that they are.  And
22  some things are just settled.  Okay, so what I try and
23  do is document everything that exists, and then what
24  happens after that, I really don't have a dog in that
25  fight, if you will.  Let me also give you an

**130**

1  inexpensive way of fixing this problem.  Provide a cup
2  dispenser right next to it.
3       Q.  Okay.  All right.  So, I mean, you said in
4  your C.V. that you want to provide fiscally responsible
5  solutions and that you want to make sure the ADA is
6  followed but at reasonable cost, correct?
7       A.  That's correct.
8       Q.  All right.  And in this particular
9  instance, I understand you don't think you have a dog
10  in the fight, but your expert report provides
11  recommendations with each particular violation that you
12  found, does it not?
13       A.  It doesn't provide all the possible
14  recommendations, --
15       Q.  It doesn't?
16       A.  -- all the possibilities.  There could be
17  dozens for any one particular problem.
18       Q.  So in no part of your report are all the
19  possible ADA-compliant modifications listed, are there?
20       A.  All the possibilities, no, not --
21       Q.  Let me finish.
22       A.  Go ahead.
23       Q.  All right.  Are there?
24       A.  No.
25       Q.  Okay.

**131**

1       A.  Nor have I ever seen one in any other
2  report.
3       Q.  All right.
4       A.  It's almost impossible.
5       Q.  I mean, you attach the 1991 standards and
6  then it -- you know, it lists that Variety could
7  install an accessible paper cup dispenser at an
8  existing water fountain on 36.304, which is on page 15
9  of your report, subsection 19.  And my question is why
10  would you recommend that Variety -- or why would you
11  recommend to Mr. Lane that Variety to spend $500
12  to move a water fountain an inch when, in fact, under
13  the regulations, there's a much more fiscally
14  responsible modification, namely providing a paper cup
15  dispenser?
16           MR. LANE:  Objection.
17       A.  Like I said, there are many ways of
18  addressing a particular problem.  I do not list every
19  potential possible remedy because there are probably
20  some that I haven't even thought of, and some that come
21  to mind and some that don't come to mind from time to
22  time.
23       Q.  Now, if Variety moved this water fountain,
24  would the water fountain comply with Section -- you
25  know, would it move it to where the spout outlet was 36

**132**

1  maximum above the finished floor?  Would it -- would
2  Variety be in compliance with 602.4?
3       A.  If it moved it down to that measurement?
4       Q.  Yeah.
5       A.  More than likely.
6       Q.  So you can't say with certainty?
7       A.  I'm pretty sure that it would.
8       Q.  Does the 2010 ADA standards require there
9  to be two water fountains at two different heights?
10       A.  2010?
11       Q.  Uh-huh.
12       A.  I don't remember.
13       Q.  Would you agree that if Variety moved this
14  water fountain, that would constitute an alteration to
15  the water fountain?
16       A.  Yes.
17       Q.  Okay.  Let's look at Section F.  You say
18  that the International Symbol of Accessibility is not
19  mounted on the latch side of the fitting room door and
20  that there's a stepping stool obstructing the approach;
21  is that right?
22       A.  There's a stepping stool obstructing the
23  maneuvering clearance.
24       Q.  Yeah.  Just -- and this is something I've
25  had to work on to make sure I understand the ADA

**133**

1 myself, but when it says that a sign must be mounted on

2 the latch side of the fitting room door, does that mean

3 on the physical door, on the side where the latch is,

4 or does it mean next to the door?

5     A. Actually, it specifically states the wall

6 next to the door.

7     Q. Okay. So with respect to these

8 violations, what Variety needs to do -- it appears that

9 there is an international symbol of accessibility but

10 it's, in fact, on the door. What they need to do is

11 move that to the right side of the door because that's

12 where the latch is; is that correct?

13     A. That's correct.

14     Q. And then with respect to the stepping

15 stool, this, again, gets into creating a policy and

16 enforcing it; would that be correct?

17     A. That's correct.

18     Q. All right. Looking at Section G, you say

19 that the umbrella protrudes more than four inches in

20 the path of travel and is mounted at 27 inches above

21 the finished floor. Looking at your measurement, it

22 appears to be that the umbrella is approximately 74

23 inches above the finished floor; would you agree?

24     A. Yes.

25     Q. Okay. All right. So this one --

**134**

1     A. Whoa. Whoa. Whoa. Whoa. I'm not -- I

2 really can't read that measurement. I think it was --

3 it was over 70, though.

4     Q. Okay. Well, it's over 70 inches. We'll

5 agree on that, all right? Okay?

6     A. Yes.

7     Q. Okay. All right. Would something that

8 protrudes 70 inches over the floor be an obstruction

9 for someone in a wheelchair?

10     A. No, not for somebody in a wheelchair.

11     Q. Let's go to --

12     A. Only for basketball players.

13     Q. Manute Bol?

14     A. And possibly tall -- tall blind people.

15     Q. Let's go to Section H of the report on

16 page 7.

17     A. And by the way, that's what protruding

18 objects were -- that's why they're in there, is

19 basically for blind -- for blind people.

20     Q. Okay.

21     A. Okay. What page?

22     Q. Page 7, Section H, you say "The emergency

23 fire exit provides two controls mounted above the

24 prescribed reach ranges," and you've got a series of

25 three pictures. Now, with the first picture, it shows

**135**

1 Ms. McKimmon, who accompanied us around the store,

2 reaching up, and as I recall, that's when she couldn't

3 figure out how to turn off the alarm. Do you remember

4 that?

5     A. That is correct.

6     Q. All right. So she's trying to figure out

7 how to turn off the alarm to the door; is that right?

8     A. That's correct.

9     Q. And then the two controls that you're

10 referring to are pictured in the middle picture, which

11 are the latch ring, and then they had a sliding lock

12 mechanism on the door; is that right?

13     A. Right, on each of the door and they're

14 pictured --

15     Q. Yeah.

16     A. -- here toward the center of the door.

17     Q. Correct. So you --

18     A. Not where she's reaching.

19     Q. Right. So you can see on the first

20 picture that the -- you can see on the first picture

21 and the second picture that the latch ring is on the

22 left door and that then the sliding lock mechanism

23 locks the two doors together; is that correct?

24     A. Yes.

25     Q. Okay. And then you can see in the first

**136**

1 picture that there is a single motion panic bar on one

2 of the exit doors; is that correct?

3     A. That's correct.

4     Q. Okay. Now, under the ADA, when you have a

5 double door emergency exit with a single motion bar on

6 one of the doors, do both the doors have to open, or

7 does one of only the doors have to open?

8     A. As long as -- as long as the door itself

9 is the correct width, --

10     Q. Okay.

11     A. -- only one would be required. Of course,

12 you may violate a fire issue. I don't know. And

13 probably the way this was originally designed, the way

14 it's stood here on this particular day, it probably was

15 a fire issue.

16     Q. Okay.

17     A. In fact, I'm pretty sure it was because

18 even if you push this bar, the doors still did not open

19 without these -- these two things being pulled.

20     Q. Well, it looks to me it doesn't open -- we

21 know for sure it doesn't open because of the control

22 that latches the two doors together, --

23     A. Yes.

24     Q. -- right? It's conceivable that the latch

25 ring on the left door is to open only the left door; is

**137**

it not?

A. Yes.

Q. Okay. And your report does not provide any measurements as to the width of these two emergency exit doors, does it?

A. No, it does not.

Q. All right. Assuming that the width of these doors is satisfactory under the ADA, if Variety -- and assuming that the latch ring on the left door was only to open the left door -- if Variety removed that latch that appears in the second picture --

A. The third picture, you mean.

Q. No, The latch in the middle picture, the second picture.

A. Okay.

Q. Because that's the one that connects the two doors, right?

A. Oh, this one, yes. Okay.

Q. And then when you say "this one," you're pointing to the picture in the middle of the top of page 7?

A. That's correct.

Q. Right. Okay. If It removed that feature, then it would be in compliance with the sections you cite here in your report, wouldn't it?

**138**

A. As long as -- what I don't understand is in this picture, I guess this is the right door?

Q. All right. Let's back -- so you're pointing to the third picture on the right?

A. That's correct.

Q. Okay. It looks to me like that's the left door. It looks to me that the latch appearing in the picture on the far right is the same latch appearing in the picture in the middle on the left-hand side of the picture?

A. You know, I don't remember. I think remember that there was one for each door, but I could be wrong.

Q. Okay. You see where in the third picture where it's just showing the latch, you've got this stain running down the door?

A. I do see a stain running down the door, yes.

Q. I mean, it's a darkened part of the picture, right?

A. Yes.

Q. And if you look at the second picture, the picture in the middle, or the picture preceding, that same stain appears in that picture next to that latch, does it not?

**139**

A. It does look to be similar, yes.

Q. Okay. All right. So let's assume that that latch is just on the left door because I think it is just on the left door.

A. Okay.

Q. And let's assume that the panic bar is installed at the proper height and requires the proper force, nothing more, and the door was wide enough. If Variety removed that latch that connects -- the sliding latch that connects the two doors in the middle picture, the fire exit would be compliant, would it not?

A. Yes.

Q. Okay.

A. I don't even know why that latch was there.

Q. I don't know why it was there either.

A. It defeats the push bar.

Q. Now, you cite here to Sections 225 and 811 of the 2010 ADA standards.

A. Okay.

Q. When I look at the 2010 ADA standards, those relate to lockers and storage areas. Do you know why you cited to those with respect to the emergency exit doors?

**140**

A. That might have been a typo.

Q. Okay. All right. Let's talk about the women's restrooms. Now, we talked earlier, and I just want to make sure we're clear, when you and Mr. Lane went into the men's and the women's restrooms, I was -- I was not there with you?

A. You were not. As I remember, you were not physically inside the restrooms.

Q. Was there anyone else physically inside the restrooms with you and Mr. Lane when you inspected those restrooms for the purposes of this Rule 34 report?

A. I don't remember anybody else being there.

Q. Okay. Do you recall moving anything in the restrooms when you did the inspection?

A. No. I did not move anything.

Q. Okay. You did not move anything when you were in there?

A. Well, I -- I opened the stall door, so I moved the stall door, opened the stall door. Besides that, no, --

Q. Okay.

A. -- I didn't move anything.

Q. Okay. So under Section A, under "Women's Restrooms," you state that the ISA signage is not

**141**

1 mounted on the latch side of the door, in violation of
2 4.30.6, and your recommendation is to move it to the
3 latch side of the door to comply with 703 of the 2010
4 standards; is that correct?
5     A. That's correct.
6     Q. Okay. Have you ever read Section 704.2 of
7 the 2010 standards?
8     A. I'm sure I have.
9     Q. Okay. And it -- and so you may remember,
10 then, that it says that signs with tactile characters
11 can be mounted to the front or the push side of a door
12 if the door has closures and no hold-open devices. Do
13 you recall that?
14     A. It has closures and no-hold, that is --
15 that is correct.
16     Q. Okay. So if this door has closures and no
17 hold-open devices, then this door would, in fact, be
18 compliant so long as the sign on the front of this door
19 is on the push side of the door and has tactile
20 characters; is that right?
21     A. Yes.
22     Q. Okay. Let's assume that it doesn't.
23 Let's assume that it doesn't have tactile characters or
24 that it doesn't have -- or it actually has hold-open
25 devices. Then in that case, the sign cannot be on the

**142**

1 front side of the door. It would need to be moved to
2 the right side of the door, which looks to be the push
3 side, and mounted on the wall for Variety to be in
4 compliance; is that correct?
5     A. I believe so.
6     Q. Okay. All right. Let's go to Section B,
7 which is on page 8. You state that the lavatory
8 obstructs the front approach because it doesn't allow
9 for 18 inches minimum beyond the latch side of the door
10 and 60 inches minimum perpendicular to the doorway; is
11 that correct?
12     A. That's correct.
13     Q. And then we've got a trash can that's
14 there right by the door as well; is that right?
15     A. That's correct.
16     Q. Okay. So lavatory refers to sink; is that
17 right?
18     A. That's correct.
19     Q. I didn't realize that until I started
20 doing these cases. I was thinking, what, I don't even
21 see a lavatory in this picture.
22     A. It's okay. I didn't know what a water
23 closet was. I was like, what is that?
24     Q. Okay. Let's see here. Now, under 4.2.4.1
25 of the 1991 standards, you can, in fact, use the area

**143**

1 underneath the lavatory as part of the 18 inches
2 required beyond the latch side of the door so long as
3 there is sufficient clearance underneath the lavatory;
4 is that correct?
5     A. That, I don't remember.
6     Q. Okay. And your report doesn't include any
7 measurements as to the height of this lavatory that you
8 can see at the picture of the top left of page 8; is
9 that correct?
10     A. That's correct.
11     Q. All right. Assuming that it did not
12 provide 18 inches minimum beyond the latch side of the
13 door due to the height of the lavatory, one -- what
14 your report is saying is that one potential
15 recommendation would be to remove that lavatory -- you
16 say relocate, but let's assume there's nowhere to
17 relocate it so you've got to remove it -- and that
18 would, in fact, then, provide the 18 inches minimum
19 required and the 16 inches minimum perpendicular
20 required in accordance with Table 404; is that correct?
21     A. Or provide an automatic door opener.
22     Q. Or provide an automatic door opener. So
23 there you gave -- you gave two possible recommendations
24 that Mr. Lane could suggest to Variety; is that right?
25     A. Yes.

**144**

1     Q. All right. So if Variety, in fact, did
2 remove that sink or put an automatic door in there
3 pursuant to your recommendations, there would, in fact,
4 be no violation with respect to the door into the
5 women's restroom; is that right?
6     A. Well, I think there would be two issues
7 here. I did not measure the second lavatory that was
8 there. And even with the first one removed, the -- the
9 best option would be the automatic door opener because
10 then you don't have to worry about that trash can being
11 there or it's not there or when it's moved and when
12 it's not moved. You don't have to worry about that
13 anymore, okay? The automatic door solves all these
14 issues. I did not measure the second lavatory. If, in
15 fact, that 60 inches is still not there, that may be an
16 obstruction also. But I -- I would have to go back and
17 remeasure it.
18     Q. And that would also depend upon whether or
19 not there was 18 inches of minimum clearance underneath
20 that second lavatory?
21     A. That would be true.
22     Q. All right.
23     A. Well, again, it's the -- yes, that would
24 be true.
25     Q. Okay. Under Section C, it appears you've

145

1  taken issue with the placement of an additional toilet
2  paper roll on top of the hand dryer. Do you recall if
3  there's a -- there's a portion of a sign in the
4  background of this picture. Do you recall what that
5  sign says?
6      A. No, I do not.
7      Q. And the only issue with respect to this
8  particular picture is just the placement of that one
9  roll of toilet paper; is that right?
10     A. Yes. Let's say the client is on the
11 restroom and he looks at the toilet paper dispenser;
12 there's nothing there. This, I take it, is the
13 replacement in case you run out. If this is located
14 too high, he's got no way of reaching it.
15     Q. Right. But all I'm asking is you show me the
16 picture of the hand dryer, but you're only -- the only
17 issue you're talking about is the --
18     A. Oh, that's true.
19     Q. -- roll of -- the toilet paper?
20     A. Yeah, the paper -- I'm sorry -- the hand
21 dryer is correct.
22     Q. Okay. No, I totally understand about --
23     A. Yes.
24     Q. -- not being able to get to the toilet
25 paper. Okay.

146

1      A. I mean, you and I would have difficulties
2  like that either, you know, have to get out of the
3  stall.
4      Q. All right. On page 9, Section D, you say,
5  "The stall door does not provide the required hardware,
6  in violation of Section 4.13.9," and you recommend that
7  door hardware that complies with Section 309 be
8  installed. And what -- with respect to door hardware,
9  the -- my reading of the 2010 ADA standards is that you
10 have to use U-shaped handles or a lever-operated
11 mechanism that does not require a tight grasp or
12 pinching or twisting. Would that be similar to your
13 recollection?
14     A. On both sides of the stall door.
15     Q. Okay. And the reason is that if you have
16 someone who does not have the use of their hands and
17 cannot grasp, pinch or twist, that's why you would need
18 to have that particular -- that's why the ADA requires
19 that --
20     A. Yes.
21     Q. -- you have that particular hardware; is
22 that correct?
23     A. On both sides of the door so you can open
24 it, and then once you're inside, to be able to close
25 the door.

147

1      Q. Okay. So what -- if at the time you did
2  this report, Variety had been running the store since
3  1980 and had never updated its bathrooms, which is
4  entirely possible, and it had this type of mechanism on
5  the door, does the 1991 ADA requirements require it to
6  come up to those 1991 regs, or does it allow you to
7  maintain your facility in the fashion that it's in
8  since it's in existence before 1991 and has not been
9  altered?
10     A. Well, I believe in 1991, the standards
11 also require a pull on both sides of the stall door.
12     Q. Right. But what I'm saying is, if --
13     A. So if it didn't comply with 1991, still
14 in 2010, they would -- they would have to comply.
15     Q. Right. What you said earlier -- and I
16 agree with what you're saying. I'm asking a different
17 question.
18     A. Okay.
19     Q. At least I'm trying to.
20     A. All right.
21     Q. So if Roses builds -- if Variety builds
22 this Roses in 1992 and installs this stall, right, it's
23 out of compliance with 1991. And it's out of
24 compliance all the way up to 2010, and then it's out of
25 compliance from 2010 forward.

148

1      A. Right.
2      Q. What about business that were in business
3  prior to the promulgation of the 1991 standards that
4  had not done any modifications to their restrooms? So
5  Bob's Restaurant -- let's go back to Bob, okay? Bob's
6  Restaurant opened in 1978. He hasn't done anything to
7  change -- his dad helped him open it. He doesn't want
8  to change anything. He hasn't done anything to modify
9  any portion of the building, including the women's
10 restroom. And the women's restroom in Bob's Restaurant
11 doesn't have the required handles under the 1991 regs.
12 But he hasn't done anything to them since 1978.
13     A. Are you referring to a grandfather clause?
14     Q. Yeah.
15     A. There is no such thing that I'm aware of.
16     Q. Okay. Under the 1991 standards, there's
17 no such thing?
18     A. As a grandfather clause.
19     Q. Right. Okay. So if your restroom was not
20 compliant the day before the ADA came out, then the day
21 after it came out, you had to start working towards
22 compliance?
23     A. Yes. That was the whole reason in putting
24 in the law.
25     Q. But the same is not true for 2010?

149

1  A. 2010 allowed you safe harbors.

2  Q. Right.

3  A. But you still have to comply.

4  Q. Right.

5  A. It's just they're allowing you now, or at

6  least there was a time even after they were put out,

7  you could actually choose which standard you wanted to.

8  That period is gone.

9  Q. Uh-huh.

10  A. Okay. This is a hypothetical question,

11  the one that you're asking, because in reality, this

12  bathroom has been substantially altered since -- since

13  my first inspection. So, hypothetically, you know,

14  I've answered that question. But in this example, this

15  one has been substantially altered.

16  Q. Right. I just was trying to understand

17  whether or not -- I think safe harbor and grandfather,

18  they're different in the sense, one, you're talking

19  about violations, and one you're talking about which

20  standard applies. But it's the same thing. It's just

21  the same safe harbors of 2010 were not in the 1991.

22  A. Well, even -- even historical buildings

23  built in the 1800's, there are ADA rules, although less

24  -- a lot less stringent, that they have to comply with.

25  So the -- so it would be reasonable to assume that if

150

1  your store was in 1980 and the law came about in 1992

2  -- or 1991, you know, you would -- you had until 1992,

3  I believe, to fix everything. You know, you were still

4  held responsible for that to fix everything.

5  Q. Uh-huh.

6  A. Now we're in 2014, different issue, just

7  like what happened in 2010 just recently. Before it

8  wasn't required you had to have pool lifts and spa

9  lifts, right? Then that was a big thing. 2010

10  mandated it, that not only each spa and each pool has

11  to have a pool lift. They're required. And it cannot

12  be temporary. It has to be fixed, permanent, okay?

13  There was a big to-do about that with the

14  hotel industry and it went to Department of Justice.

15  Department of Justice delayed actually enforcing that

16  particular action and gave them another six months to

17  comply, and that period of time is over now. And now

18  you see a lot of hotels -- I see a lot of them now

19  where the pool lifts are there. The spa pool lifts are

20  there.

21  It's the same thing. Once the law is,

22  then, yes, you've got to -- you have to bring it up to

23  standard. But then they -- they did allow you to -- to

24  exercise the safe harbors if you complied with 1991.

25  Q. Okay. Since doing this report, have you

151

1  been back in the women's restroom at Roses?

2  A. No, I have not.

3  Q. Okay. Going to Section E of the report on

4  page 9, you state that the toilet paper dispenser is

5  not appropriately mounted and that the location of the

6  roll of toilet paper requires a tight grasp. Let's

7  take the second issue. If the toilet paper roll had

8  been in the toilet paper dispenser, then that -- this

9  tight grasp issue would have not been a violation; is

10  that correct?

11  A. As long as that dispenser was free -- free

12  -- free --

13  Q. Free flowing?

14  A. -- free flowing, yes.

15  Q. Okay.

16  A. That would be correct.

17  Q. Okay. And so when you say that the toilet

18  paper dispenser needs to be mounted between seven to

19  nine inches in front of the water closet, that's as if

20  you drew a line from the very front of the toilet to

21  the wall and then measured out seven to nine inches,

22  that's where the toilet paper dispenser would have to

23  be installed; is that correct?

24  A. That's correct.

25  Q. Okay. And you don't mention it here --

152

1  let's see -- or do you? You do mention that the outlet

2  of the dispenser has to be between 15 and 48 inches

3  above the finished floor, but it doesn't appear there's

4  any measurement as to the actual height of this

5  dispenser; is that correct?

6  A. That's correct. Usually when there's not

7  a measurement, it's because it was within --

8  Q. Compliance?

9  A. -- compliance.

10  Q. Okay. So all that has to happen is the

11  structural modification of moving this toilet dispenser

12  out to be in front of the water closet by seven to nine

13  inches for that violation to be satisfied?

14  A. Right. To move that paper towel -- excuse

15  me -- the toilet paper dispenser, and also to maintain

16  it with toilet paper and not the way that it's

17  portrayed there in the picture. And the tight grasp

18  means they're grasping behind, in this particular

19  picture, grabbing that toilet paper. If they have bad

20  dexterity issues, that toilet paper is rolling down the

21  floor and they'll never be able to use it.

22  Q. So you cite to 4.27.4 in this part of the

23  report. If you'd turn to page 38 of your report for

24  me, it appears to me that the restriction against tight

25  grasp and pinching or twisting applies only to controls

153

1 and operating mechanisms.  Do you see that in 4.27.4?

2      A. Yes.

3      Q. And then if you turn to page 36 with

4 respect to dispensers, all the 1991 ADA standard said

5 was, "The toilet paper dispenser shall be installed

6 within reach, as shown in dispensers that control

7 delivery, and not permit continuous paper flow, shall

8 not be used."  I'm not sure that makes sense.  But do

9 you know, is there a graph -- "Dispensers" in this

10 section is capitalized.  Do you know what that refers

11 to?

12      A. I'm sorry.  Let me get to the --

13      Q. Sure.  Page 36 --

14      A. Page 36.

15      Q. -- Section 4.16.6.

16      A. .6.

17      Q. It says, "Toilet" -- basically what it

18 says is, "Toilet papers -- toilet paper dispensers

19 shall be installed within reach" and "as shown in

20 dispensers that control delivery or not permit

21 continuous paper flow, shall not be used."  Do you know

22 whether the 1991 ADA standards have particular

23 measurements with respect to toilet paper dispensers or

24 are the only ones found in the 2010 standards in this

25 section that you cite to page 9?

154

1      A. There are -- there are figures for the

2 toilet paper dispensers that are in the ADA, the 1991.

3 The reason why this particular one is brought to 2010

4 is because of the massive alteration that's been done

5 to this particular toilet.  So the dispenser would have

6 to be brought to 2010 standards.

7      Q. Okay.  And how do you know that there's

8 been massive alterations to this water closet -- to

9 this toilet?

10      A. Well, you can -- you can see from the

11 pictures that there's this wide area here.

12      Q. And are you pointing to the picture at the

13 top of page 9 on the left?

14      A. Yes.

15      Q. Okay.

16      A. And it looks like -- it looks like

17 there's been a partition moved.  It looks like there's

18 been plumbing moved.

19      Q. Okay.  And so based upon that visual

20 inspection, your belief is that this water closet went

21 through substantial renovations since 1991?

22      A. Actually, the stall itself.

23      Q. The stall itself, okay.

24      A. And everything in the stall.  Well, not

25 everything, but the stall itself and different

155

1 components of the stall.

2      Q. Okay.  If you'd turn to page 10, we're now

3 moving on to the men's restrooms.  Again, you list the

4 signage location to be a violation.  And as we

5 discussed with the women's room, 704.2 does actually

6 allow for that sign to be located where it is, so long

7 as it's on the push side of the door and there's no

8 hold-open devices; is that correct?

9      A. That's correct.

10      Q. Okay.

11      A. As long as there's no hold-open devices.

12      Q. But if there were, then what Variety would

13 need to do is to move that sign to the left side of the

14 door in this picture; is that right, assuming that

15 that's the push side of the door?

16      A. Or the latch side, yes.

17      Q. Yeah, okay.  Latch side.  Thank you.

18      A. Right.

19      Q. All right.

20      A. I believe they have.  I mean, that's what

21 I visually saw today.

22      Q. Okay.  So this re- -- this violation has

23 been remedied; is that right?

24      A. Yes.

25      Q. Okay, great.  Okay.  With Section B, we

156

1 again -- you again allege that there's not the 18

2 inches beyond the latch side and the 16 inches minimum

3 perpendicular, and it appears that you've got

4 measurements from the top of the sink to the door in

5 the wall; is that correct?

6      A. As close as I could --

7      Q. Okay.

8      A. -- and take the pictures.

9      Q. And there's no -- there's no measurement

10 in here as to whether or not there is sufficient

11 clearance underneath the lavatory to allow for the 18-

12 inch minimum beyond the latch side; is that right?

13      A. That's correct.

14      Q. All right.  Assuming there was not, then

15 can you say from your inspection whether removal of

16 this sink would have created 18 inches beyond the latch

17 side of the door and 16 inches minimum perpendicular to

18 the doorway?

19      A. From this picture, I can't tell.

20      Q. Okay.

21      A. Because we may run into the same problem

22 with the two lavatories.  I can't tell if there's just

23 the one or if there's two.

24      Q. Okay.  But you -- as you sit here today,

25 you don't know -- you don't know; is that what you're

157

1 saying?

2    A. I don't remember.

3    Q. Okay. Going to page 11 and Section C, you
4 say that the door requires greater than five pounds of
5 pressure to operate?

6    A. Yes.

7    Q. Is door pressure something that fluctuates
8 regularly? And by that, I don't mean from one door to
9 another, but I mean once you set the pressure required
10 to open the door, is it something that changes, lessens
11 or increases on a daily or weekly basis?

12    A. It requires maintenance.

13    Q. How often does it require maintenance?

14    A. I don't know. It depends. It depends on
15 use. It depends -- there's a -- there's a lot of
16 variables.

17    Q. And can you tell from looking at this
18 picture whether or not -- I mean, can you tell what
19 that reading is? Let me back up. Strike that.

20    what device is this in this picture on the
21 right at the top of page 11?

22    A. Okay. This is what's called a push-pull
23 measuring device, door pressure device.

24    THE WITNESS: You okay, Chris?

25    MR. PURYEAR: Napkin?

158

1    MR. LANE: I'm fine. I'm good.

2    MR. PURYEAR: Okay. Water down

3    the wrong pipe?

4    MR. LANE: Yeah.

5    MR. PURYEAR: Do you need a

6    break?

7    MR. LANE: No. Go ahead.

8    MR. PURYEAR: Okay. All right.

9    Q. And so it's a push-pull device?

10    A. Yes, push-pull.

11    Q. And so how do you -- how do you use it?

12    A. Different ways of using it. You -- first
13 of all, you set -- you set the little ring right here,
14 this black ring --

15    Q. Uh-huh.

16    A. -- to zero here, okay? Then you go on --
17 in this particular case, I went on the push side of the
18 door, which is the outside, and pushed in. And you go
19 to 45-degree angle and then stop and measure it.

20    Q. Okay.

21    A. In other words, you open the door simply
22 by using the device.

23    Q. And is the device something that you have
24 to calibrate?

25    A. No.

159

1    Q. All right. Never use any calibration?

2    A. It's spring -- spring loaded. It's always
3 the same.

4    Q. It's always the same? The spring doesn't
5 ever wear out?

6    A. I imagine it might. Mine never has, but.

7    Q. How old is your push-pull mechanism that's
8 pictured in this picture?

9    A. I'd say it's about five years.

10    Q. About five years. Who makes it?

11    A. That, I don't remember.

12    Q. Do you have it with you today?

13    A. I do not.

14    Q. Okay. And so all that's required under
15 the ADA is that the push or pull pressure required to
16 open the door is less than five pounds?

17    A. Less than five pounds for interior doors.

18    Q. For interior doors. That's right.

19    A. Yes.

20    Q. Because there's a different standard for
21 exterior, right?

22    A. Not so much, but, yes.

23    Q. Okay.

24    A. The reason being is -- is the exterior
25 doors have to be greater than five pounds and it's a

160

1 fire issue.

2    Q. Okay.

3    A. Okay.

4    Q. Let's go to Section D on page 11. You
5 raised the location of the toilet paper and also the
6 toilet paper dispenser not being mounted appropriately,
7 and then you don't have any other complaints about the
8 grab bars or the toilet, which you said earlier means
9 that those elements of this facility -- of this part of
10 the facility would be in compliance; is that right?

11    A. Yes, in this particular paragraph, yes.

12    Q. Okay. So, then, with respect to the
13 toilet paper dispenser, again, if you look at the
14 picture on the right, bottom right of page 11, you
15 would just need to draw a line straight out from the
16 front part of the toilet and then measure seven to nine
17 inches off of that to appropriately place the toilet
18 paper dispenser; is that correct?

19    A. Yeah, as long as it was 15 inches minimum
20 to 48 inches maximum.

21    Q. Okay. Now, looking at these two pictures,
22 Mr. Childers, it appears to me that -- are these two
23 pictures the same -- are the same toilet?

24    A. Yes.

25    Q. Okay. All right. In one, you're just

161

1  looking at the toilet from the entryway, and the one,
2  you're almost standing right over the toilet like
3  you're getting ready to use it looking down at the
4  floor; is that right?
5      A. That's correct.
6      Q. Okay. Now, you told me earlier that when
7  you and Mr. Lane were in the bathroom, you didn't move
8  anything, yet when I look at these two pictures, in the
9  picture on the left, the toilet paper roll is sitting
10 on top of the dispenser, and then I look at the picture
11 on the right where you're measuring the violation --
12     A. Uh-huh.
13     Q. -- and the picture is now sitting -- the
14 toilet paper is now sitting on the floor. And you just
15 told me that these two pictures are of the same toilet.
16     A. Uh-huh.
17     Q. So did someone other than you or Mr. Lane
18 move that roll of toilet paper?
19     A. Actually, I don't -- it might have fallen
20 down. I could tell you I did not physically move it.
21 I do not physically move anything. I record exactly
22 what's there when I see it, period. You can also see
23 -- so it may have -- it may have gotten knocked over
24 when I did a -- when I did the measurement. I'm not
25 sure. But in the second picture, you see it's probably

162

1  that same roll, I guess, and you also see another roll
2  that's right beside it.
3      Q. Right. And if you look at the first
4  picture, you have what's an empty -- what looks to me
5  like an empty roll --
6      A. Right.
7      Q. -- on the floor, right, --
8      A. Well, --
9      Q. -- where someone may have used the toilet
10 and emptied the roll and it got on the floor. I mean,
11 it doesn't look to me like there's much of any toilet
12 paper on there.
13     A. Right. Right.
14     Q. But then you look at the second picture
15 and that roll is -- the full roll is now sitting on the
16 floor. And what you're saying is it might have
17 accidentally fallen over?
18     A. When I -- when I was taking my
19 measurements, it might have gotten knocked over.
20     Q. And so then you decided to take a
21 measurement of it once it had been knocked on the floor
22 by either you or Mr. Lane?
23     A. What are you talking about?
24     Q. Well, look, it's sitting -- on the left
25 picture it's sitting on top of the toilet paper

163

1  dispenser, right?
2      A. Right.
3      Q. Which I will admit is not necessarily the
4  best place for it, not the proper place, necessarily,
5  but it's sitting right there on top of the dispenser.
6  Then it somehow mysteriously gets on the floor by the
7  time you take the second picture, which you're telling
8  me under oath that you didn't move.
9      A. I did not move it.
10     Q. And that's fine. Okay. You tell me you
11 didn't move it. Then it must have -- you know, it fell
12 on the floor somehow. But then you're now measuring to
13 that roll of toilet paper in the second picture.
14     A. No. No. I'm measuring to the paper to-
15 -- I mean the toilet paper dispenser. I'm not
16 measuring that roll of toilet paper. Even if I was, it
17 doesn't -- it doesn't matter. That measurement doesn't
18 matter at all, where that roll of toilet paper is.
19     Q. Okay. So you're -- you're --
20     A. I'm measuring the dispenser itself.
21     Q. So when you measured the dispenser,
22 though, you told me that you measure from the front of
23 the water closet; is that right?
24     A. Yes.
25     Q. And that would be -- I'm going to point it

164

1  out to you right here. Look at this, just so I -- I
2  want to make sure you're seeing the same thing I am.
3  When you look at picture 11, when you say the front of
4  the --
5      A. Oh, your pictures are a lot clearer than
6  mine. This is what I'm looking at --
7      Q. Okay. Yeah.
8      A. -- when I'm trying to say --
9      Q. Well, here -- here's one.
10     A. Okay. All right.
11     Q. All right. So on the picture of the
12 bottom right-hand corner of 11, this is -- right here,
13 this is the front of the toilet, the part that
14 protrudes the most from the wall; is that correct?
15     A. That's correct.
16     Q. All right. And so if you were measuring
17 from the front of the toilet -- my line is not very
18 straight -- your -- your tape measure should stop where
19 I just drew a line, and that's the point at which you
20 would measure from the front of the toilet to determine
21 the location of the toilet paper dispenser; is that
22 right?
23     A. Uh-huh.
24     Q. And so what you're saying is you're not
25 measuring to this toilet roll; you're actually

**165**

1  measuring from the front of the toilet to measure this;
2  is that right?
3      A. Let me take a look at the picture.
4      Q. Okay. Hold on a second.
5          MR. PURYEAR: Can I see your
6          copy, Chris? Well, none of our pictures
7          are very clear, are they?
8      Q. What I'm asking you for is on this
9  particular picture can you tell -- on my -- on my copy
10 can you tell where your measuring stick stops and
11 starts?
12     A. I think from here -- it looks like my
13 measuring stops here, okay?
14     Q. Okay.
15     A. Which is this part.
16     Q. Okay. So you're not measuring the toilet
17 paper roll that's no longer sitting on top of the --
18     A. That's correct.
19     Q. -- toilet paper dispenser?
20     A. That has nothing to do with --
21     Q. Okay.
22     A. -- any citing. I don't even think I cited
23 it except for that it wasn't in the roll.
24     Q. Now let's go to page 12. And I'll be
25 honest with you, my picture doesn't look any better

**166**

1  than yours here, but you say that the stall door does
2  not provide the required hardware. Now, you went back
3  today. Did you go in the men's room?
4      A. Yes.
5      Q. Had the proper hardware been installed on
6  this particular door?
7      A. As I recall, yes.
8      Q. Great. When you went back today, you said
9  you spent ten minutes in the store and you went to the
10 majority of the store. That's what you said; is that
11 correct?
12     A. I walked through the store, yes.
13     Q. Did you take any -- any measurements while
14 you were in the store?
15     A. No.
16     Q. Okay. But I assume you did a visual
17 inspection?
18     A. Yes.
19     Q. All right. I'm not smirking. I'm smiling
20 just because it's pretty common sense. I mean --
21     A. Well, yeah.
22     Q. Did you do any shopping while you were
23 there?
24     A. Not today, no. I went to the Food Lion
25 afterwards.

**167**

1      Q. Okay. From your visual inspection today,
2  what violations of the ADA did you see?
3      A. Pretty soon we'll get this place
4  completely compliant because it seems like every time I
5  write a report, things are changed and modified, and
6  that's a good thing. So today I saw the sa-- -- similar
7  things, the 36-inch path was still not maintained.
8      Q. Where -- where in the store did you see
9  that?
10     A. Pretty much in the same areas that you
11 were referring to earlier, in the -- the clothing
12 sections.
13     Q. Okay. Did you see a 36-inch path not
14 maintained in any other sections of the store, other
15 than the clothing sections?
16     A. I did see that since my Rule 34 report,
17 all the major -- the major aisles that we had spoke
18 about with the supporting beams were moved and modified
19 and were able to be modified without using merchandise
20 -- without losing merchandise, so that was good.
21     Q. And when you say that they had been
22 modified, my understanding is that the actual very
23 large shelving -- I mean, they're eight-foot shelving
24 racks --
25     A. Right.

**168**

1      Q. -- they've -- they've actually been
2  physically moved --
3      A. Yes.
4      Q. -- to where the support beams that support
5  the ceiling are no longer a barrier?
6      A. No longer an obstacle, yes.
7      Q. All right. Okay. So all issues with the
8  support beams have been remedied. You said you visited
9  the men's room?
10     A. Yes.
11     Q. Did you see any violations with respect to
12 the men's room?
13     A. Yes.
14     Q. What did you see?
15     A. The stall door still not self-closing.
16 And, like I said, I didn't measure, so visually I did
17 see that one of the lavatories had been removed, and it
18 looks like there's an existing lavatory. Again,
19 visually, I'm not sure whether the latch-side clearance
20 is still obstructed by the existing lavatory or not.
21 I'm just not sure.
22     Q. Now, is there any other lavatories in the
23 bathroom?
24     A. No. That's the only one.
25     Q. Do you know if code requires you to have a

169

1  lavatory in the bathroom?
2      A. Yes.
3      Q. Okay.
4      A. That's why I still believe the automatic
5  door opener is the solution.
6      Q. But you didn't take any measurements, as
7  you said, when you were in there?
8      A. I did not, no.
9      Q. Anything else in the men's room?
10     A. No.
11     Q. Okay. So we talked about the clothing
12 sections. We talked about support beams. We talked
13 about the men's room. Did you see any violations with
14 any other aspect of the store?
15     A. Yes. There were still some protruding
16 objects.
17     Q. And where did you see the protruding
18 objects?
19     A. And, actually, yes, there's two things.
20 The protruding objects were still -- oh, gosh. I don't
21 remember at this point.
22     Q. Okay.
23     A. I think it may have still been around the
24 -- where there were some umbrellas or something. I
25 think that still may be an existing issue.

170

1      Q. But you're not -- you can't recall exactly
2  what --
3      A. Right. I'm not sure. I'm not sure at
4  all. And I think there was one area beyond the
5  clothing section where there were still -- I take that
6  back. We'll just leave that alone.
7      Q. Okay. So what we have is there's not a
8  36-inch path in the clothing sections. All the issues
9  with the support beams have been satisfied. The only
10 violations in the men's room were that the stall door
11 was not self-closing and that you cannot visually
12 determine whether the 18 inches and 16 inches required
13 were met?
14     A. Also, I just remembered that trash can was
15 still obstructing the door in the men's bathroom. So
16 that seems to be -- that's still failure to maintain.
17 It still seems to be existing and an ongoing issue.
18     Q. And then -- all right. So we've got the
19 stall door. You couldn't tell about the measurements.
20 The trash can in the men's room. You didn't go into
21 the women's room?
22     A. Did not go into the women's room.
23     Q. Good job. And then you say that you saw
24 that there were still protruding objects but that you
25 can't recall what they were?

171

1      A. That's correct.
2      Q. All right. Anything else?
3      A. I think that's it.
4      Q. Okay. Let's take a short break.
5         (OFF THE RECORD AT 2:51 P.M.)
6         (BACK ON THE RECORD AT 2:59 P.M.)
7      Q. All right, Mr. Richardson [sic], when we
8  left off, we just finished talking about -- oh, I'm
9  sorry. Mr. Childers. I apologize. When we left off,
10 we had just finished talking about your Section E on
11 page 12 of your report, --
12     A. Yes.
13     Q. -- which is Deposition Exhibit 6. If you
14 would, turn to page 13 for me. And this appears to be
15 a page and a half portion of the report that's entitled
16 "Recommendations of the Rule 34 Inspection." It
17 appears to me that these are just a copy-and-paste of
18 all the recommendations that were found under each of
19 the individual sections we just talked about; is --
20     A. Yes.
21     Q. -- that correct?
22     A. It's done -- yes.
23     Q. Just make sure I finish for her purposes.
24 But is that -- am I correct?
25     A. Yes.

172

1      Q. Okay. So there's nothing additional in
2  this section of the report that we have not covered in
3  this deposition?
4      A. That is correct.
5      Q. All right. Have you ever heard of a man
6  named Michael Chenail?
7      A. I have heard of him.
8      Q. What have you heard about him?
9      A. I've heard that he's a ADA expert in some
10 part of North Carolina.
11     Q. Okay.
12     A. Never met him. Don't know much about him.
13     Q. Okay. Have you ever read any ADA report
14 authored by Mr. Chenail?
15     A. I don't recall.
16     Q. Okay. When you and I met the first time
17 at the Roses, at the end of that meeting, you, me and
18 Mr. Lane had a little bit of discussion about
19 settlement. Do you remember that?
20     A. I remember we had a discussion about
21 possible settlement.
22     Q. Okay. What do you recall about that
23 conversation?
24     A. I recall that -- from my understanding --
25 obviously, I've not been involved with the majority of

173

1 the settlement discussions that have been had by you
2 and Mr. Lane, so I was not privy to that. Don't know
3 all the ins and outs of details. My understanding was
4 -- is that as part of the settlement, that the
5 negotiations included -- the negotiations included some
6 type of a global agreement that the group and/or
7 plaintiff would never sue another Roses or Variety
8 store -- let's put it this way, a Variety store --
9     Q. Uh-huh.
10    A. -- again forever and anon.
11    Q. Have you -- other than your conversations
12 with Mr. Lane, if any, have you had any conversations
13 about possible settlement with respect to Variety
14 Stores with any other individual?
15    A. With any other individual, no.
16    Q. Okay. So you haven't talked to
17 Mr. Richardson about it?
18    A. About settling?
19    Q. Uh-huh.
20    A. We -- not this particular case. We may
21 have talked about what was felt as far as being -- you
22 know, what he would be interested in doing and about
23 what the group interests were and so forth and maybe
24 kind of come up with a comprehensive solution for this
25 entire process.

174

1     Q. And when you say "group interests," who
2 are you referring to?
3     A. I was referring to -- in this particular
4 case, it would have been National.
5     Q. And by that, you mean National Alliance
6 for Accessibility?
7     A. Yes.
8     Q. Are you some kind of spokesperson for the
9 group?
10    A. I am not.
11    Q. Do you ever try and help them recruit
12 members?
13    A. I do not.
14    Q. Well, are you -- have you ever been
15 involved -- I mean, I guess what I'm trying to
16 understand is why would you be involved in settlement
17 discussions at all if you're not the plaintiff in the
18 case and you're not a member of NAA?
19    A. No. Usually I'm not involved in
20 settlement discussions.
21    Q. But it sounded like you're involved in
22 some. And it's not -- it's just a point of curiosity.
23    A. Right.
24    Q. You know, is there -- are there --
25    A. No, I just try to -- I just envision that

175

1 we should try to resolve -- not "we," but any type
2 there's a -- any type of where there's a disagreement,
3 there should be some type of a agreeable resolution.
4 And I think in the ADA cases, in these ADA cases, that
5 there should be because it really is black and white.
6 There's really not to argue about -- I mean, nothing
7 really to argue about. And eventually the creation of
8 the universal design, you know, benefits everybody in
9 society. So that's kind of my, you know, outlook on
10 this in total, not specifically referring to this case.
11    Q. In the last two years, what percentage of
12 your salary is from your work relating to ADA lawsuits?
13    A. About 90 percent is derived from plaintiff
14 work, yes; 10 percent for either proactive or defendant
15 work. I wish it were the other way around. Actually,
16 I wish there wasn't any work to be done. I wish it was
17 all done.
18    Q. And I appreciate your answer to the
19 question answering my next question, but let's just
20 make sure we're on the same page here. My question was
21 what is the overall percentage of your salary in the
22 last two years that related to your work on ADA
23 lawsuits, and you said 90 percent for plaintiffs' work
24 and 10 percent for defendants' work. Are you saying
25 that you did not have any other source of income in the

176

1 last two years, other than your work relating to ADA
2 lawsuits?
3     A. Restated differently, I'm stating that
4 I've had no additional income for work -- any work not
5 related to ADA Assistance Group. In other words, when
6 I -- that's my income.
7     Q. Okay. So when we talked about the -- if
8 you were a pie, right, --
9     A. Uh-huh.
10    Q. -- you did two things. You did work
11 related to ADA Assistant Group, and then you did what
12 you called these various projects.
13    A. Right.
14    Q. And then you said of the slice that makes
15 up various projects, that slice is only a couple of
16 hours a week of the entire week, right?
17    A. Right.
18    Q. And then the only -- you could divide that
19 slice into two pieces, and it would be the creation of
20 the business plan for the National Accessibility
21 Foundation, and then helping your son with his upcoming
22 patent; is that right?
23    A. That's correct.
24    Q. Okay. Now, there's a separate pie, this
25 income pie. What you're -- what I'm hearing you say --

177

1  and I just want to make sure we're clear -- is that 100
2  percent of that pie -- and that represents your income
3  for the last two years -- 100 percent of that is
4  related to your work for ADA Assistance Group?
5      A. That is correct. That's the way it
6  currently stands, yes.
7      Q. Okay. And then of that pie, 90 percent of
8  it is related to your plaintiffs' work, and then 10
9  percent is split between the proactive work and the
10 defendants' work you do?
11     A. That is correct.
12     Q. But you wish that slice of the pie was
13 bigger?
14     A. No. I wish it was the other way around.
15     Q. The other way around, okay. Why is that?
16     A. Why is that? Because that means -- what I
17 have experienced in other -- well, I'll just tell you
18 what my experiences are. I have marketed ADA
19 Assistance Group. I've gone out and talked with
20 business owners and so forth, and it's been a
21 tremendous uphill battle to get them to do anything
22 proactively. It just has been. In fact, if I -- if
23 that was my -- if that's all I did, I would starve,
24 okay? It just seems that there's no interest at all in
25 property owners removing these barriers. That's been

178

1  my experience, my personal experience.
2      Q. And you've never approached Variety Stores
3  with respect to marketing ADA Assistance Group; is that
4  right?
5      A. Unfortunately, this came up first. That
6  is true. So I -- obviously, I can't. I can't, while
7  these cases are ongoing. But that's also -- and I'm
8  not faulting property owners 100 percent because a lot
9  of the issues are -- especially in these times -- it
10 comes down to the economy, the economics and them
11 having the funds to do that. And that's what drove me
12 to start the National Accessibility Foundation, to kind
13 of fix that piece that's -- in my opinion that's been
14 missing, okay?
15     You go to a bank now that -- they don't
16 offer those types of loans and so forth. So I thought
17 that would -- that would help and assist. And if you
18 provide that piece, you might be able to get additional
19 owners to buy into that. Because let's say, for
20 example, a small -- a small business owner -- a small
21 shopping center, let's say. For them to come -- become
22 compliant, it probably would be an average of 50- to
23 $100,000.
24     Q. Say that one more time.
25     A. For them to become complaint, to remove

179

1  the barriers.
2      Q. For who to become compliant?
3      A. The facility itself, okay? I'm just
4  saying on average.
5      Q. And that's for shopping centers?
6      A. A small shopping center.
7      Q. All right.
8      A. Okay. So let's give the example of 50- to
9  $100,000. That amortized -- that loan amortized over
10 five years is, what, at low interest/no interest rates?
11 It comes out to be somewhere between 5- and $700, more
12 than likely. And I don't think there's too many
13 business owners that could not afford that over a
14 monthly period of time, given so many years to actually
15 make that happen. So if that was put into place, I --
16     MR. LANE: Let him ask a
17     question, okay?
18     THE WITNESS: All right. Sorry.
19     Q. So what would happen if that was put into
20 place?
21     A. Well, I believe that more property owners
22 would take advantage of that and actually remove the
23 barriers and make a more universal design for
24 everybody.
25     Q. When did you -- so is NAF registered in

180

1  Florida?
2      A. Yes. NAF is a registered nonprofit.
3      Q. When did you register it?
4      A. I believe it was 2011.
5      Q. All right. And how did NAF get its
6  funding in order to loan -- loan this money?
7      A. Actually, we're at that -- we're close to
8  being at that stage now. As I mentioned before, I'm 90
9  percent finished with the -- writing the business plan.
10 And then the next step is to go and seek funding from
11 large major corporations, and I believe we can also get
12 federal funds from the government.
13     MR. PURYEAR: I have no further
14     questions.
15 CROSS EXAMINATION BY MR. LANE:
16     Q. Mr. Childers, you did your Rule 34
17 inspection on August 8, 2013, right?
18     A. Yes.
19     Q. And did you find the Roses at 3020 North
20 Main Street, Hope Mills, North Carolina to be violative
21 of the ADA at that point in time?
22     A. Yes.
23     Q. And did you memorialize the areas of
24 noncompliance that you found in your Rule 34 inspection
25 report?

**181**

1 A. Yes.

2 Q. And is that Exhibit 6 to your deposition?

3 A. Yes.

4 Q. And did you revisit this same Roses store

5 subsequent to the preparation of your report?

6 A. Do you mean the date of the inspection --

7 oh, you mean after this report?

8 Q. Yes, sir.

9 A. Yes.

10 Q. And did you find that Roses had made some

11 modifications to the store?

12 A. Yes.

13 Q. Did it appear to you that those

14 modifications were designed to address some of the

15 concerns that you raised in your Rule 34 report?

16 A. Yes.

17 Q. And did you revisit the Roses store that's

18 the subject of this case today?

19 A. Yes.

20 Q. Today, as we sit here, is the store still

21 noncompliant?

22 A. Yes, sir. There are still some

23 noncompliant issues.

24 Q. And if the defendant's expert authored a

25 report in December saying that as of December of 2013,

**182**

1 that the store was fully compliant, would you disagree

2 with that?

3 MR. PURYEAR: Objection.

4 A. Yes. I would disagree with fully

5 compliant.

6 Q. And you identified five areas of

7 noncompliance that you observed as recently as today,

8 right?

9 A. Yes.

10 Q. One was the 36-inch path of travel had not

11 been maintained and was not present?

12 A. Yes.

13 Q. And you saw that at multiple locations

14 throughout the store?

15 A. Primarily in the clothing departments.

16 Q. And was that the men's clothing and the

17 women's clothing?

18 A. As I remember, the women's -- the women's

19 area. I don't remember whether or not the men's was or

20 not.

21 Q. And did you see any improvement in the

22 path of travel since your Rule 34 inspection, or was it

23 substantially the same?

24 MR. PURYEAR: Objection.

25 A. As far as the clothing section, it was

**183**

1 substantially the same. I did see and notice that the

2 major shelving that we talked about before was moved

3 away from the beams, so in that case -- in that

4 particular instance, it did get better.

5 Q. And is this -- have you seen similar

6 problems in other Roses stores?

7 A. Yes.

8 Q. Would you characterize the failure to

9 provide a 36-inch path of travel to be a chronic

10 problem throughout the Roses stores that you have

11 visited?

12 A. Yes.

13 Q. And approximately how many Roses stores

14 have you had the opportunity to observe?

15 A. I don't remember. Probably -- I'm

16 guessing maybe somewhere between three and five.

17 Q. And have you seen a similar problem with

18 the lack of a 36-inch path of travel at every Roses

19 store that you've had the opportunity to observe?

20 A. Yes. They seem to have a systemic

21 problem.

22 Q. And the second thing that you identified

23 was the men's restroom at the Roses that's the subject

24 of this case still does not have a self-closing stall

25 door; is that right?

**184**

1 A. Yes.

2 Q. How much would it cost, approximately, to

3 remedy that problem?

4 A. Probably less than $50.

5 Q. And you also identified the latch side

6 clearance in the men's restroom looked to be

7 insufficient; is that right?

8 A. It looked to be that there was not enough

9 maneuvering clearance still.

10 Q. And approximately what would you estimate

11 the cost to remediate that issue to be?

12 A. To install an electric door opener which

13 would prevent different things obstructing that -- that

14 door from time to time, approximately 2,000 per door.

15 Q. And you also talked about you still

16 observed some protruding objects during today's visit

17 to the store; is that right?

18 A. Yes.

19 Q. Is that a problem that you had also

20 observed during the Rule 34 inspection last August?

21 A. Yes.

22 Q. What would it cost to remedy that problem?

23 A. Nominal. It's just a matter of either

24 placing something underneath it so they would have cane

25 detection, or maybe closing the umbrella. If it wasn't

ANCHORS COURT REPORTING, INC.
CERTIFIED COURT REPORTERS
P.O. BOX 1255 - LUMBERTON, NC 28359-1243 PHONE/FAX: (866)789-7783

Case 5:13-cv-00155-F Document 35 Filed 03/03/14 Page 23 of 27

**185**

1 an umbrella, if it was something else, if you just put
2 an object below it, below that 27 inches, it would
3 provide enough cane detection so that people wouldn't
4 run into it. And not only for blind people, but for
5 people that maybe are texting on their phone, they
6 wouldn't run into it. So it -- so it could be a safety
7 feature too.
8 Q. And the fifth existing violation that you
9 testified to was the trash can is still obstructing the
10 door in the men's bathroom; is that right?
11 A. Yes.
12 Q. And is that similar to what you saw back
13 last August?
14 A. Yes.
15 Q. And is that a failure-to-maintain type of
16 problem?
17 A. Yes.
18 Q. How much would it cost to remediate that
19 problem?
20 A. Again, nominal. They would have to create
21 -- create a policy, teach the employees and whoever
22 maintains the restrooms, so it should be nominal.
23 Q. And based on your experience, what would
24 you estimate the cost of the remodeling, renovations
25 that you have observed that have taken place at the

**186**

1 Roses store to be?
2             MR. PURYEAR: Objection.
3 A. You mean to date, since the initial
4 report?
5 Q. Yes, sir.
6 A. I would probably say somewhere around
7 15,000, approximately.
8 Q. Would you characterize the renovations
9 that have taken place as significant?
10 A. Yes.
11             MR. PURYEAR: Objection.
12 A. Yes.
13 Q. And would you characterize the renovations
14 that have taken place to date as more than nominal in
15 cost?
16             MR. PURYEAR: Objection.
17 A. Yes. There -- what has been altered is
18 definitely more than nominal in cost.
19 Q. And for a defendant that can afford those
20 type of already accomplished renovations, is it your
21 opinion that the remaining remediation would be readily
22 achievable?
23 A. Yes.
24             MR. PURYEAR: Objection.
25 Q. Is it your opinion that the five remaining

**187**

1 areas of noncompliance that you've identified as of
2 today would be readily achievable for an enterprise
3 with the financial resources to have made the
4 renovations that you've already witnessed?
5             MR. PURYEAR: Objection.
6 A. Based on what I've already seen, the
7 renovations that have been made from time to time, the
8 remaining issues are very, very small, maybe less than
9 -- maybe less than $7,500. I have not seen their
10 financials, but it seems to be -- based on historical
11 of what they've done so far, I would assume that they
12 would be able to financially afford to make this
13 particular store 100 percent compliant.
14 Q. And if you were able to review their
15 financials, could you provide a more detailed opinion
16 as to their financial wherewithal to perform the
17 remaining remediations?
18 A. Probably a store with a parent their --
19 that size, probably -- yeah, definitely -- you know,
20 definitely upon looking at cash flow, upon looking at
21 the financials, yes, would be able to make that
22 determination.
23 Q. And do you have education and experience
24 in the financial industry?
25 A. I have experience in the financial

**188**

1 industry.
2 Q. Are you able to read balance sheets?
3 A. Yes.
4 Q. Are you able to read P and L statements?
5 A. Yes.
6 Q. Those are all my questions for now. Thank
7 you.
8             MR. PURYEAR: I have a few
9             follow-ups.
10 REDIRECT EXAMINATION BY MR. PURYEAR:
11 Q. Mr. Childers, when you say that the
12 remaining fix-it would cost $7,500, what do you base
13 that on?
14 A. I'm basing it -- since I didn't bring any
15 materials here with me, I'm guesstimating that the two
16 door openers, that would be about 2,000 each. And
17 depending upon -- if you do have to purchase maybe
18 tiered or a different type of clothing to create that
19 36-inch space, that may -- that may be the majority of
20 the balance. The door opener -- you know, the stall
21 door opener and closer on both stalls, you're looking
22 at about a hundred dollars there, maybe.
23 Q. Anything else?
24 A. Let's see. Protruding objects, nominal,
25 so it shouldn't be any cost to that. It's just a

**189**

1  matter of rearranging a few things.  And creating a
2  policy to maintain the accessible features should be
3  nominal also.  It just has to be upkept.
4  Q.  Okay.
5  A.  That should be it.
6  Q.  All right.  So we've got $2,000 for the
7  door openers.  Excuse me.
8  A.  Each.
9  Q.  For the automatic doors, --
10  A.  Correct.
11  Q.  -- right?  A hundred dollars for the door
12  opener on the stall, nominal costs for protruding
13  objects and creating a policy, and then the rest you
14  guesstimate maybe would be made up by this buying new
15  racks; is that right?
16  A.  If required.  I'm not sure it's required.
17  Q.  So the two openers is 2,000.  The door
18  opener -- that's 2,100, so that means the remainder of
19  your 7,500 is --
20  A.  Whoa.  Whoa.  Whoa.  Wait.  Wait.  Wait.
21  Two-thousand per --
22  Q.  So you --
23  A.  Wait.  Wait.  Two-thousand per door.
24  Q.  Oh, per door, okay.  All right.
25  A.  Okay.  So you're at 4-.

**190**

1  Q.  All right.  And then you add the 100 for
2  the total for the stalls, --
3  A.  Right.
4  Q.  -- so that leaves $3,400 for buying tiered
5  or new racks?
6  A.  Yes.
7  Q.  And what you just said is you're just
8  totally guessing as to that number; is that right?
9  MR. LANE:  Objection.
10  A.  It is an approximate number.
11  Q.  It is an approximate number.  And what did
12  you use to form the basis of your opinion that solving
13  the dilemma in the women's clothing department would
14  cost $3,400?
15  A.  It was an approximation.
16  Q.  Okay.
17  A.  Again, there may not be -- it may be
18  substantially less.  There may be no additional monies
19  required and maybe just a matter of relocating the
20  existing racks.
21  Q.  Okay.  So it's just an approximate number?
22  A.  It's an approximate number.
23  Q.  Okay.  When we started this deposition, I
24  asked if you had inspected any other Roses, and you
25  said you had inspected the one at Westwood, right?

**191**

1  A.  Yes.
2  Q.  And you just testified that you had been
3  in three to five other Roses.  Can you name the other
4  Roses you've been in besides the ones --
5  A.  That's what --
6  Q.  Let me finish.  Have you been in Roses --
7  can you name the Roses you've been in other than the
8  one located at the Village Shopping Center and the one
9  at Westwood?
10  A.  To the best of my memory, I can remember
11  the Roses at Bordeaux Shopping Center.
12  Q.  Is that the same as the one on Westwood?
13  A.  No.
14  Q.  All right.  So we've got the one on
15  Westwood.  We've got the one on Bordeaux, and we've got
16  the one at village; is that correct?
17  A.  That's correct.
18  Q.  All right.  Is the one at Westwood still
19  open?  Do you know?
20  A.  I don't know.
21  Q.  When was the last time you were there?
22  A.  I don't remember, but it's been awhile.
23  Q.  What about the one on Bordeaux?  Is the
24  one on Bordeaux still open?
25  A.  It's not open.

**192**

1  Q.  It's not open, okay.  And we know the one
2  at village is open at least as of 11 o'clock this
3  morning?
4  A.  At least as of.
5  Q.  All right.  All right.  Can you remember
6  any other Roses you've been to, other than the ones at
7  Westwood, Bordeaux and Village Shopping Center?
8  A.  Not at this time.
9  Q.  Okay.  Can you remember being inside any
10  other store owned or operated by Variety Stores other
11  than the three you just named?
12  A.  No, I can't remember any.
13  Q.  If Roses had a thousand stores, and you've
14  been in three of them, would you be able to say that
15  Roses had a chronic problem related to design of its
16  women's department in all of its stores?
17  MR. LANE:  Objection.
18  A.  Not based on three, no.
19  Q.  All right.  Would you be able to say it's
20  a systemic problem?
21  A.  I would be able to say when I'm in three
22  of them and 100 percent of the three, all three were
23  noncompliant, I mean, not a little, but major
24  noncompliance issues like that existed in this
25  particular case, when you see that 100 percent of the

193

1 time, you can guesstimate and extrapolate that there's
2 probably a substantial number because -- of other
3 stores that are noncompliant.
4      Q. Have you had any training or classes in
5 statistics?
6      A. I have not.
7      Q. Okay. All right. So what you just said
8 was by looking at three stores, you would be able to
9 extrapolate a pattern that you would be comfortable
10 applying to a thousand stores; is that your statement?
11               MR. LANE: Objection.
12      A. I said you could. I didn't say -- I said
13 that based on the fact that if you go to three and
14 they're 100 percent, and it's just logical for me that
15 statistics -- you know, talking statistics, that if you
16 go to three and 100 percent of the three, it seems
17 logical to me that if you've got a thousand stores,
18 that there's going to be a substantial amount of stores
19 that are noncompliant.
20      Q. Okay.
21      A. That somehow these three were the only
22 three, okay, that were noncompliant and all the ones
23 were compliant seems to me highly unlogical. [sic]
24      Q. And that's based on what?
25      A. It's based on logic.

194

1      Q. Logic, okay. Not based on statistics,
2 just based on --
3      A. But also --
4      Q. -- logic; is that right?
5      A. Primarily on logic.
6               MR. PURYEAR: I have no further
7          questions.
8 RECROSS EXAMINATION BY MR. LANE:
9      Q. Mr. Childers, have you ever been to a
10 Maxway store off of Yadkin Road in Fayetteville, North
11 Carolina?
12      A. I don't -- I don't remember.
13      Q. Have you seen the same or similar problems
14 in a hundred percent of any Variety store that you've
15 ever been in?
16               MR. PURYEAR: Objection.
17      A. Of the three that I recall being in, or
18 the three that I've written reports for, they all had
19 the same problems.
20      Q. Those are all my questions. Thank you.
21               MR. PURYEAR: Thank you for your
22          time, Mr. Richardson. [sic]
23          THE WITNESS: Childers.
24          MR. PURYEAR: Sorry. It's been
25          a long day.

195

1          THE WITNESS: It has been a long
2          day.
3      (DEPOSITION TESTIMONY CONCLUDED AT 3:32 P.M.)
4          (REVIEW AND SIGNATURE RESERVED)

196

1 NORTH CAROLINA
  JOHNSTON COUNTY
2
3      I, Tammy Johnson, CVR-CM-M, a Notary Public
4 in and for Johnston County, North Carolina, do hereby
5 certify that Charles Childers appeared before me on
6 January 31st, 2014 and was duly sworn or affirmed prior
7 to giving testimony in this proceeding; that he was
8 subsequently examined, and that the deponent was
9 required to review the deposition transcript; and that
10 to the best of my knowledge, the foregoing pages 1-195
11 constitute a true and complete transcript of said
12 examination.
13      I further certify that I am not attorney nor
14 counsel for, nor related to or employed by any of the
15 parties to the action in which this deposition was
16 taken, and further, that I am not a relative or
17 employee of any attorney or counsel employed by the
18 parties hereto, nor interested, directly or indirectly,
19 in the matters of controversy, nor financially
20 interested in the result of this action.
21      In witness whereof, I have hereunto set my
22 hand and seal on this, the 13th day of February, 2014.
23
24          _____
25          Tammy Johnson, CVR-CM-M
            Certified Verbatim Reporter
            Notary Commission #20011560080

197

```
 1            IN THE UNITED STATES DISTRICT COURT
          FOR THE EASTERN DISTRICT OF NORTH CAROLINA
 2                      WESTERN DIVISION

 3   _____
     RONALD RICHARDSON, Individually,]
 4                                   ]
               Plaintiff,            ]
 5                                   ]
          v.                         ]
 6                                   ]
     VARIETY STORES, INC., a Foreign ]
 7   Corporation,                    ]
                                     ]
 8             Defendant.            ]
     _____]
 9

            I, Charles Childers, hereby certify that I
10   was first duly sworn prior to the commencement of my
     deposition, which was given before Tammy Johnson,
11   CVR-CM-M, in Fayetteville, North Carolina on January
     31, 2014, and that review, examination, and signing of
12   the transcript was not waived.
            I further certify that the foregoing pages 1
13   through 195 constitute a true and accurate transcript
     of said deposition;
14          (A)_____and no changes are necessary.
            (B)_____however, I desire the changes
15   attached here to be incorporated into said transcript.
            Witness my hand and seal on this, the _____
16   day of _____, _____.

17                              _____
                                     Charles Childers
     State of _____
18   County of _____
     Sworn to and subscribed before me
19   on this, the _____ day of _____, _____.

20   My Commission Expires:

21   _____          _____
                                         NOTARY PUBLIC
22

23

24

25
```

198

```
 1                      ERRATA SHEET
                DEPOSITION OF CHARLES CHILDERS
 2                TAKEN ON JANUARY 31, 2014

 3

 4   PAGE # LINE # CURRENT CHANGE      REASON FOR CHANGE

 5   _____

 6   _____

 7   _____

 8   _____

 9   _____

10   _____

11   _____

12   _____

13   _____

14   _____

15   _____

16   _____

17   _____

18   _____

19   _____

20   _____

21   _____

22   _____

23   _____

24

25   WITNESS INITIALS:_____
```

AND ASSOCIATES COURT REPORTING
CERTIFIED COURT REPORTERS
P.O. BOX 1248, LUMBERTON, NC 28359-1248   PHONE/FAX: (866)789-7789